ORAL ARGUMENT NOT YET SCHEDULED

**Nos. 23-1032, 23-1073**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

DAHUA TECHNOLOGY USA INC.
and
HIKVISION USA, INC.,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

*Respondents*.

_____

On Petition for Review of an Order of the
Federal Communications Commission

_____

**INITIAL JOINT BRIEF OF PETITIONERS
HIKVISION USA, INC. AND DAHUA TECHNOLOGY USA, INC.**

_____

*Counsel Listed on Next Page*

Andrew D. Lipman
Russell M. Blau
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave NW
Washington, DC 20004
(202) 739-3000
andrew.lipman@morganlewis.com
russell.blau@morganlewis.com

*Counsel to Dahua Technology USA, Inc.*

Christopher J. Wright
Timothy J. Simeone
John T. Nakahata
John R. Grimm
Deepika H. Ravi
Annick Banoun
HWG LLP
1919 M St. NW, 8th Floor
Washington, DC 20036
(202) 730-1300
cwright@hwglaw.com

James M. Cole
Tobias S. Loss-Eaton
Sidley Austin LLP
1501 K St. NW
Washington, DC 20005
(202) 736-8000
tlosseaton@sidley.com

June 8, 2023

*Counsel to Hikvision USA, Inc.*

## CERTIFICATE AS TO PARTIES, ORDERS, AND RELATED CASES

Pursuant to D.C. Rule 28(a)(1), Petitioners state as follows:

**Parties and Amici**

Petitioners are Dahua Technology USA Inc. and Hikvision USA.  The Federal Communications Commission and the United States of America are Respondents.  Motorola Solutions, Inc. is an Intervenor for Respondents.

**Ruling Under Review**

Petitioners seek review of the Report and Order and Order titled *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program, Protecting Against National Security Threats to the Communications Supply Chain Through the Competitive Bidding Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, FCC 22-84, ET Docket No 21-232, EA Docket No. 21-233 (rel. Nov. 25, 2022) ("*Order*").

**Related Cases**

On March 1, 2023, the Judicial Panel on Multidistrict Litigation consolidated two cases in this Court.  The first was a petition for review captioned *Hikvision USA, Inc. v. Federal Communications Commission, et al*., No. 23-1032, filed on February 13, 2023, in this Court.  The second, captioned *Dahua Technology USA Inc. v. Federal Communications Commission, et al.,* No. 23-1073,

was originally filed as No. 23-206 on February 14, 2023, in the U.S. Court of

Appeals for the Ninth Circuit.  There are no other related cases.

## CORPORATE DISCLOSURE STATEMENTS

Dahua Technology USA Inc. ("Dahua USA") is a direct, wholly owned subsidiary of Dahua Technology (HK) Ltd., a corporation incorporated under the laws of Hong Kong. Dahua Technology (HK) Ltd. is a direct, wholly owned subsidiary of Zhejiang Dahua Technology Co., Ltd., a corporation whose stock is publicly traded on the Shenzhen Stock Exchange. Dahua USA has no other direct or indirect parent companies. Dahua USA is an importer of video security systems and related equipment manufactured by its parent company and, through distributors and dealer partners, sells this equipment in the United States.

Hikvision USA Inc. ("Hikvision USA") is a California corporation and wholly owned subsidiary of Hangzhou Hikvision Digital Technology Co., Ltd., which is publicly traded on China's Shenzhen Stock Exchange. Hikvision USA is an importer of security equipment, primarily security cameras and related devices, manufactured by its parent company and mostly sold to small- to medium-sized businesses as end users by a network of distributors and dealer partners across the United States.

As a publicly traded company, Hikvision USA's parent company, Hangzhou Hikvision Digital Technology Co., Ltd., has a diverse set of public and private shareholders. The largest shareholder, owning approximately 36.35% of the company, is China Electronics Technology HIK Group Co., Ltd., a state-owned

enterprise of the People's Republic of China. The second largest shareholder—
with 10.28% of Hangzhou Hikvision Digital Technology Co., Ltd—is its founder,
Hong Kong resident Kung Hung Ka (also written Gong Hongjia). No other person
or entity holds more than 10% of the shares of Hangzhou Hikvision Digital
Technology Co., Ltd. Other than Hangzhou Hikvision Digital Technology Co.,
Ltd., no other person or entity holds a 10% or greater ownership interest in
Hikvision USA.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, ORDERS, AND RELATED CASES ............... i

CORPORATE DISCLOSURE STATEMENTS ..................................................... iii

TABLE OF AUTHORITIES ...................................................................... vii

GLOSSARY ................................................................................................ xii

INTRODUCTION ......................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 5

STATEMENT OF ISSUES ........................................................................ 5

STATUTES AND REGULATIONS .......................................................... 6

STATEMENT OF THE CASE ................................................................... 6

    I.    Factual Background .......................................................................... 6

    II.    Statutory and Regulatory Background. ........................................ 9

        A.    Section 889 of the National Defense Authorization Act. .......... 9

        B.    The Secure Networks Act of 2019 ........................................... 11

        C.    The Secure Equipment Act of 2021 ......................................... 15

        D.    Sections 302 and 303 of the Communications Act .................. 16

    III.    The Challenged Order. ...................................................................... 18

SUMMARY OF ARGUMENT ............................................................... 19

STANDING ............................................................................................. 23

STANDARD OF REVIEW ...................................................................... 23

ARGUMENT ........................................................................................... 24

    I.    The Order Exceeds the Commission's Statutory Authority under the
Secure Networks Act .......................................................................... 24

A.    Only Equipment "Essential" to the Provision of Broadband Services Can Be Placed on the Covered List.............................26

B.    Covered List Restrictions Do Not Apply to Petitioners' Video Equipment Just Because It Is Identified in Section 889. ..........31

II.    The Order Exceeds the Commission's Authority Under Title III of the Communications Act. ...........................................................................40

III.    The Commission's Interpretation of "Critical Infrastructure" is Contrary to Law....................................................................................46

A.    The Commission's Interpretation of "Critical Infrastructure" Is Not Entitled to Chevron Deference. .........................................47

B.    The Commission's Interpretation of "Critical Infrastructure" Is Contrary to the Term's Ordinary Meaning, Statutory Context, and Congressional Intent............................................................50

CONCLUSION .......................................................................................58

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993).................................................................58

*Am. Libr. Ass'n v. FCC*,
   406 F.3d 689 (D.C. Cir. 2005).................................................................44

*Buljic v. Tyson Foods, Inc.*,
   2 F.4th 730 (8th Cir. 2021) ....................................................................54

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1984)......................................................................... 23, 24

*Comcast Corp. v. FCC*,
   600 F.3d 642 (D.C. Cir. 2010).................................................................45

*Cruz v. Am. Airlines, Inc.*,
   193 F.3d 526 (D.C. Cir. 1999).................................................................37

*DeNaples v. Off. of Comptroller of the Currency*,
   706 F.3d 481 (D.C. Cir. 2013).................................................................50

*Duncan v. Walker*,
   533 U.S. 167 (2001)..................................................................................56

*EPA v. EME Homer City Generation, L.P.*,
   572 U.S. 489 (2014)....................................................................................4

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018)..................................................................... 24, 47

*Farrell v. Blinken*,
   4 F.4th 124 (D.C. Cir. 2021)...................................................................24

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)............................................................... 4, 22, 43

*Fed. Lab. Rel. Auth. v. U.S. Dep't of Treasury*,
   884 F.2d 1446 (D.C. Cir. 1989)...............................................................50

*Glenn v. Tysons Foods, Inc.*,
   40 F.4th 230 (5th Cir. 2022)...................................................................54

*Judulang v. Holder*,
   565 U.S. 42 (2011).....................................................................................57

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..............................................................23

*Maglioli v. All. HC Holdings LLC*,
  16 F.4th 393 (3d Cir. 2021) ...............................................54

*Marx v. Gen. Revenue Corp.*,
  568 U.S. 371 (2013).............................................................35

*Mercy Hosp., Inc. v. Azar*,
  891 F.3d 1062 (D.C. Cir. 2018)..........................................35

*Mitchell v. Advanced HCS, LLC*,
  28 F.4th 580 (5th Cir. 2022)...............................................54

*Mot. Picture Ass'n of Am. v. FCC*,
  309 F.3d 796 (D.C. Cir. 2002)............................................45

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019)................................................24

*Mylan Labs., Inc. v. Thompson*,
  389 F.3d 1272 (D.C. Cir. 2004)..........................................47

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  138 S. Ct. 617 (2018)................................................. 30, 35

*Nutritional Health All. v. FDA*,
  318 F.3d 92 (2d Cir. 2003) .................................................43

*Return Mail, Inc. v. U.S. Postal Serv.*,
  139 S. Ct. 1853 (2019)........................................................38

*Scheduled Airlines Traffic Off., Inc. v. Dep't of Def.*,
  87 F.3d 1356 (D.C. Cir. 1996)............................................48

*Smith v. City of Jackson*,
  544 U.S. 228 (2005)............................................................52

*Sorenson Commc'ns Inc. v. FCC*, 7
  55 F.3d 702 (D.C. Cir 2014)...............................................50

*U.S. v. Menasche*,
  348 U.S. 528 (1955)............................................................56

*United States v. Mead Corp.*,
  533 U.S. 218 (2001)............................................................48

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)............................................................57

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ...................................................................44

*Yates v. United States*,
    574 U.S. 528 (2015) .....................................................................36

**Statutes**

5 U.S.C. § 706 ................................................................................24

10 U.S.C. § 2224 ............................................................................52

23 U.S.C. § 119 ..............................................................................52

28 U.S.C. § 2342 ..............................................................................5

42 U.S.C. § 5195c ....................................................................52, 55

47 U.S.C. § 1302 ..........................................................2, 11, 19, 27

47 U.S.C. §§ 151 *et seq* ............................................................5, 41

47 U.S.C. § 1603 ......................................................................12, 29

47 U.S.C. § 1608 ............................................2, 12, 20, 26, 27

47 U.S.C. § 302a ......................................................3, 16, 17, 41, 43

47 U.S.C. § 303 ..............................................................................18

47 U.S.C. § 402 ................................................................................5

47 U.S.C. § 1602 ............................................................................11

47 U.S.C. § 1601 ..............2, 3, 12, 13, 20, 25, 26, 30, 33, 34, 35, 36, 37, 38, 39, 49

50 U.S.C. § 4552 ............................................................................52

Communications Act of 1934,
    Pub. L. No. 90-379, § 302, 82 Stat. 290 (codified as amended at 47 U.S.C. §§
    151 *et seq*.) ........................................................5, 16, 41

John S. McCain National Defense Authorization Act for Fiscal Year 2019,
    Pub. L. No. 115-232, § 889, 132 Stat. 1636 ...................4, 10, 30, 40, 46, 48, 51

John S. McCain National Defense Authorization Act for Fiscal Year 2019,
    Pub. L. No. 115-232, § 1703, 132 Stat. 1636 ...................................52

Secure Equipment Act of 2021,
    Pub. L. No. 117-55, § 2(a)(2), 135 Stat. 423 ...................................16

**Regulations**

31 C.F.R. § 800, App. A ................................................................53

47 C.F.R. §§ 2.901 *et seq.*..................................................................7

**Administrative Decisions**

*In the Matter of Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in A Reasonable & Timely Fashion, & Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996*, Report, 14 FCC Rcd. 2398 (1999)..................................................................27

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Report and Order, Further Notice of Proposed Rulemaking and Order, 34 FCC Rcd. 11423 (2019)..........................................10

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Second Report and Order, 35 FCC Rcd. 14284 (2020)............................................................ 13, 14, 29, 49

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Third Report and Order, 36 FCC Rcd. 11958 (2021).................................................... 14, 15, 29

*Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*, Notice of Proposed Rulemaking and Notice of Inquiry, 36 FCC Rcd. 10578 (2021) .......................15

*Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program, Protecting Against National Security Threats to the Communications Supply Chain Through the Competitive Bidding Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, FCC 22-84, ET Docket No 21-232, EA Docket No. 21-233 (rel. Nov. 25, 2022) ...................i, 5, 19, 25, 32, 34, 38, 39, 42, 43, 45, 46, 47, 55, 57

**Other Authorities**

165 Cong. Rec. H10282-01 (daily ed. Dec. 16, 2019) .................................... 11, 28

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..................................................56

Comments of Hikvision USA, Inc., ET Docket No. 21-232 (filed Sept. 22, 2021) ...................................................31

*Essential, adj. and n.*, Oxford Eng. Dictionary, http://www.oed.com/view/Entry/64503 (last visited June 1, 2023)...................28

*Essential*, *Black's Law Dictionary* (11th ed. 2019)................................................28

FCC, List of Equipment and Services Covered By Section 2 of The Secure Networks Act, available at https://www.fcc.gov/supplychain/coveredlist (last updated Sept. 20, 2022) .........................................................................14

H.R. Rep. No. 116-352 (2019).................................................................11

H.R. Rep. No. 90-1108 (1968).................................................... 16, 17, 41

*Legislating to Secure America's Wireless Future*, Congress (Sept. 27, 2019), https://www.congress.gov/116/meeting/house/109991/documents/HHRG-116-IF16-Transcript-20190927.pdf .........................................................27

*Legislating to Secure America's Wireless Future: Hearing on H.R. 2281, H.R. 4461, H.R. 4459, H.R. 4500, H.R. Res. 575, H.R. 2063, and H.R. 4462 Before the Subcomm. on Comms. & Tech., of the H. Comm. on Energy & Commerce*, 116th Cong. 2 (2019) .........................................................................11

Oxford English Dictionary, https://www.oed.com/view/Entry/44592 (last visited June 2, 2023).......................................................................................54

Merriam-Webster, https://www.merriam-webster.com/dictionary/critical (last visited June 2, 2023) ...........................................................................54

S. Rep. No. 90-1276 (1968) .....................................................................17

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Covered List | Covered List of communications equipment produced by foreign companies in the 2019 Secure and Trusted Communications Networks Act |
| FCC or Commission | Federal Communications Commission |
| Petitioners | Hikvision USA, Inc. and Dahua Technology USA, Inc. |
| Secure Networks Act | 2019 Secure and Trusted Communications Networks Act |
| Secure Equipment Act | 2021 Secure Equipment Act |
| Section 889 | Section 889 of the 2019 National Defense Authorization Act |
| Section 302a | 47 U.S.C. § 302a |
| Section 303 | 47 U.S.C. § 303 |
| Section 1601 | 47 U.S.C. § 1601 |

## INTRODUCTION

Petitioners Dahua USA and Hikvision USA are the U.S. subsidiaries of China-based companies that manufacture video surveillance equipment. Petitioners' video equipment typically includes a camera and recorder so that, for example, a business can monitor its storeroom, loading dock, or cash registers. End users across America—mostly small- and medium-sized businesses—use this equipment to protect their personnel and property. But in the challenged *Order*, the Commission has effectively barred Petitioners from bringing nearly all new products into the U.S. market, crippling their ability to compete in the United States.

Congress instructed the Federal Communications Commission (the "Commission") to publish a "Covered List" of communications equipment produced by foreign companies in the 2019 Secure and Trusted Communications Networks Act (the "Secure Networks Act"). At first, inclusion on the List merely prohibited the use of universal service funds to purchase covered equipment or services, and the Act provided funding for small broadband providers to "rip and replace" some covered equipment. But Congress later expanded the Covered List's impact by directing the Commission in the 2021 Secure Equipment Act ("Secure Equipment Act") to deny new authorizations for listed equipment to be

1

sold or used in the United States.  The challenged *Order* implements that command.

Petitioners' video equipment, however, does not belong on the Covered List. As its name suggests, the Secure Networks Act aims to protect the nation's communications networks.  The Act is thus tailored to focus on network equipment that is "*essential to" the provision of broadband telecommunications service*. 47 U.S.C. § 1608(4), *see also id.* §§ 1601, 1608(1), and 1302(d)(1) (emphasis added).  The Commission did not even try to show that Petitioners' equipment meets that definition.  Nor could it—broadband networks plainly can function without these devices.

The Secure Networks Act imposes two other threshold requirements before equipment can be placed on the Covered List.  First, even essential communications equipment cannot be placed on the Covered List unless *Congress or a national security agency* (which Congress defined *not* to include the Commission) has found that such equipment is produced by an entity that poses a national security risk.  *Id.* § 1601(b)(1).  Second, the *Commission* must also find that the devices possess specific capabilities posing a threat to broadband networks, such as being capable of misrouting or permitting visibility into user data, or otherwise posing an unacceptable risk to national security.  *Id.* § 1601(b)(2).

The Commission did not try to show that Petitioners' equipment satisfies § 1601(b)(2). Instead, it declared that Petitioners' video equipment belongs on the Covered List because it falls under a different statute, Section 889 of the 2019 National Defense Authorization Act ("Section 889"). That is wrong. The Secure Networks Act does cross-reference Section 889, but that reference satisfies only the § 1601(b)(1) requirement that Congress or a national security agency find that equipment produced by an entity poses risks. *See id*. § 1601(b)(1). Falling under Section 889 does *not* satisfy the separate requirement that devices must have statutorily specified capabilities to be placed on the Covered List. *See id*. § 1601(b)(2). Equipment produced by entities identified in Section 889 is thus *eligible* for inclusion on the Covered List—but *only if* it also satisfies the other requirements of the Secure Networks Act's plain text. The Commission's contrary conclusion reads whole provisions out of the statute.

The Commission also erred by concluding alternatively that it could bar Petitioners' equipment from authorization under 47 U.S.C. § 302a. Section 302a, enacted in 1968, gives the Commission authority to make regulations to prevent harmful interference to radio communications. It has no bearing on broadband networks or national-security concerns. The Commission's contrary conclusion plucks out a short phrase that qualifies this provision—specifying that such regulation addressing interference must be "consistent with the public interest"—

3

and treats that phrase as giving the Commission a free-standing power to make *any* rules it deems in the public interest.

That is, five decades after Section 302a's enactment, the Commission claims to have discovered that the statute provides the agency with an essentially unbounded rulemaking power over all electronic devices sold in the United States—and that allows the Commission to proscribe authorization for equipment without regard to the limitations Congress wrote into the Secure Networks Act. That view clashes with Section 302a's plain language, violates the principle that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 528 (2014) (citing *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 458 (2001)), and ignores the rule that agencies cannot use older, broadly written statutes to override limits in more recent, more specific laws, *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000).

The *Order* is also overbroad because even "essential" broadband equipment produced by Petitioners may be subject to the Covered List *only* insofar as it is used for certain purposes. One of those purposes is "surveillance of critical infrastructure." John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 889(f)(3)(B), 132 Stat. 1636, 1917 ("Section 889"). In the *Order*, the Commission badly misconstrued the term "critical

infrastructure"—reading it so broadly that it includes, for example, a grocery store or laundromat—and thereby banned nearly all uses of Petitioners' equipment. Accordingly, even if Petitioners' equipment is otherwise subject to restrictions arising from the Covered List, the Court should vacate the Commission's definition of "critical infrastructure."

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a).  The Federal Communications Commission issued the final order under review, *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program, Protecting Against National Security Threats to the Communications Supply Chain Through the Competitive Bidding Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, ET Docket No. 21-232, EA Docket No. 21-233 (rel. Nov. 25, 2022), pursuant to its regulatory jurisdiction under the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.*  Petitioners timely filed their petitions for review on February 13, 2023, and February 14, 2023.

## STATEMENT OF ISSUES

1.    Whether the Federal Communications Commission exceeded its authority under the Secure Networks Act and the Secure Equipment Act in

applying those statutes to equipment that is not essential to the provision of advanced communication services;

2.     Whether the Commission exceeded its authority under the Secure Networks Act and the Secure Equipment Act in applying those statutes to equipment that the Commission has never determined either to have specific, statutorily proscribed capabilities or to pose any threat to the provision of advanced communication services;

3.     Whether the Commission exceeded its authority under 47 U.S.C. §§ 302a and 303 in applying those decades-old provisions—which provide the Commission authority to prevent interference with radio communications—to devices that the Commission has never determined to pose any threat of interference;

4.     Whether the Commission adopted an unlawful interpretation of "critical infrastructure" for purposes of Section 889, the Secure Networks Act, and the Secure Equipment Act.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in an addendum to this brief.

## STATEMENT OF THE CASE

### I.     FACTUAL BACKGROUND.

Petitioners are U.S. subsidiaries of China-based companies that manufacture video equipment—mainly security cameras and associated video storage devices

6

called "network video recorders"—sold through dealers and distributors in the United States.  American businesses use Petitioners' cameras and recorders to protect their personnel and property.  Like most electronic devices, these products require authorization under the Commission rules, 47 C.F.R. §§ 2.901 *et seq*., because they generate electromagnetic radiation within the radio spectrum.

Petitioners' products are not telecommunications network equipment—they are not and cannot be used to provide broadband or other communications services. Instead, these devices are peripheral, non-network devices known as "customer premises equipment," i.e., equipment bought by end users and used on their property.  An end user may choose to connect Petitioners' cameras and recorders to their own networks or the Internet, but this equipment does not need Internet connectivity to function, and of course the Internet can function perfectly well without this equipment.

Petitioners' video cameras and recorders can, for example, be used to provide security at a convenience store.  There might be multiple cameras both inside and outside the store, perhaps showing the parking area, service entrance, different aisles of the store, and the cash register.  Those cameras might all connect to one or more network video recorders located on the premises.  The video security system might also include video screens, allowing employees to view the video streamed by the cameras or captured by the recorder.

In this kind of deployment, end-user businesses would need to decide how "connected" they want this video security system to be. The end user could choose to install this equipment, for example, on an isolated security network with *no* connection to—i.e., remaining entirely physically separate from—the broader enterprise network or the public Internet.

Alternatively, an end-user business could choose to connect Petitioners' equipment to its internal enterprise network, but also separate that equipment from the rest of the network using internal firewalls to block inbound and outbound dataflow within the internal network. Such firewalls could, for example, block any data flow between the Petitioners' cameras and the business' cash registers or computers. In this kind of deployment, the entire enterprise network would also be protected from the public Internet by a firewall restricting or blocking (at the end user's option) the data that can flow between the internal network and the Internet.

Finally, although Petitioners' devices generally do not require Internet connectivity to function, an end user may also *choose* to connect these devices directly to the Internet. End users who select this approach can implement an array of cybersecurity best practices (which Petitioners encourage) to restrict unauthorized access to data flows from the cameras. Again, these security steps typically include deploying a firewall between the enterprise network and the public Internet to limit data flows.

8

However Petitioners' equipment is used, control of that equipment and the features enabled rests entirely with the end users and the independent professionals they hire to install the devices. Petitioners are not involved in those decisions because they have no relationships with end users. Petitioners do not sell their products directly to consumers in the United States—they sell through unaffiliated distributors and dealers that market primarily to small- and medium-sized businesses. Moreover, because Petitioners do not sell products directly to U.S. consumers, their sales processes do not produce (and Petitioners do not maintain) information about the identities of end users. Petitioners also do not collect end-user data through a warranty or returns process; those processes are handled by Petitioners' dealers.

## II.    STATUTORY AND REGULATORY BACKGROUND.

The challenged *Order* strictly limits Petitioners' ability to import, market, and sell their equipment in the United States. The Commission claims several statutes support its *Order*:

### A.    Section 889 of the National Defense Authorization Act.

Adopted in 2018, Section 889 prohibits the federal government from using or procuring equipment specifically identified in the statute, and also bars the use of federal funds to buy that equipment. These restrictions apply with respect to Petitioners only when the specified equipment is used "[f]or the purpose of public

9

safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes."  Section 889(f)(3)(B).  Section 889 applies across the government and has been implemented in federal procurement regulations by the General Services Administration, Department of Defense, and National Aeronautics and Space Administration.

In November 2019, the Commission issued the *Supply Chain First Report and Order*,[1] which adopted a rule prohibiting the use of federal funds to "purchase or obtain any equipment or services produced or provided" by a company designated by the Commission as "posing a national security threat" to communications networks.  *Supply Chain First Report and Order* ¶ 26.  That order initially designated Huawei and ZTE—Chinese companies manufacturing a wide array of telecommunications network equipment—as posing such a national security threat.  *Id.* ¶¶ 43–63.  It did not designate Petitioners.  The Commission primarily relied on Sections 201(b) and 254 of the Communications Act, and Section 105 of the Communications Assistance for Law Enforcement Act, but also found that its rule and designations were "consistent with section 889[.]"  *Id.* ¶¶ 28–38.

---

[1] *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Report and Order, Further Notice of Proposed Rulemaking and Order, 34 FCC Rcd. 11423 (2019) ("*Supply Chain First Report and Order*).

**B.    The Secure Networks Act of 2019.**

In September 2019, the House Subcommittee on Communications and Technology met to consider "legislative proposals … to secur[e] our Nation's telecommunications infrastructure," including "the Secure and Trusted Communications Network Act." *Legislating to Secure America's Wireless Future: Hearing on H.R. 2281, H.R. 4461, H.R. 4459, H.R. 4500, H.R. Res. 575, H.R. 2063, and H.R. 4462 Before the Subcomm. on Comms. & Tech., of the H. Comm. on Energy & Commerce*, 116th Cong. 2 (2019).  Describing the Act, the Chairman of the Subcommittee explained:

> [U]ntrusted equipment in U.S. telecommunications networks poses an unacceptable threat to our national security . . . .  Small broadband providers in mostly rural parts of our country have turned, understandably, to the cheapest option they could fund to provide service.  All too often, that has been Chinese equipment provided by Huawei or ZTE.

165 Cong. Rec. H10282-01, *H10285 (daily ed. Dec. 16, 2019) (statement of Rep. Doyle).  The subsequent House Report similarly indicated that Congress was concerned that "individual Chinese telecommunications firms, including Huawei Technologies Co. Ltd," posed "significant threats" to U.S. networks.  H.R. Rep. No. 116-352, at 9 (2019).

As enacted, the Secure Networks Act directs the Commission to create a list of "covered communications equipment and services" that are not eligible for Commission-administered subsidies, *see* 47 U.S.C. § 1602(a)(1)—the "Covered

List"—and whose removal and replacement costs are eligible for reimbursement under a program administered by the Commission. *See id.* § 1603(c)(1). To be included on the Covered List (and therefore subject to restrictions resulting from the List), equipment must be "*essential* to the provision of advanced communications service," *id*. § 1608(4) (emphasis added), where "advanced communications service" is defined to mean "high-speed, switched broadband telecommunications capability"—that is, broadband services. *Id*. §§ 1608(1), 1302(d)(1).

While *only* equipment "essential to" providing broadband services can appear on the Covered List, the List does not include *all* such equipment and services. Instead, the Secure Networks Act establishes a two-step process to determine which "communications equipment or services" should go on the Covered List. The Commission can put a device on the Covered List—and apply restrictions under the Secure Networks Act—only if both steps are satisfied. *First*, there must be a determination that equipment made by an entity poses an unacceptable national-security risk. *Id.* § 1601(b)(1). The Commission itself cannot make this determination. Rather, an unacceptable-risk finding must be "based solely on" four types of determinations made by Congress or national security agencies: (i) a specific determination made by an executive branch interagency body with appropriate national security expertise; (ii) a determination

12

by the Department of Commerce; (iii) the equipment or service being defined as "covered telecommunications equipment or services" in Section 889; or (iv) a determination by a national security agency. *Id.* § 1601(c)(1)–(4). *Second*, if the equipment is subject to such a determination, it may be put on the Covered List only if it *also* has certain telecommunications capabilities rendering the device capable of threatening communications networks. The device must be able to: (i) route or redirect user data traffic or allow visibility into user data traffic, (ii) cause the network of a provider to be remotely disrupted, or (iii) otherwise pose an unacceptable risk to the national security of the United States. *Id.* § 1601(b)(2)(A)–(C).

In December 2020, the Commission released the *Supply Chain Second Report and Order*.[2] That order adopted a very broad "construction" of the statutory term "essential to." The Commission found that *all* "equipment . . . *used in* fixed and mobile broadband networks . . . can be reasonably considered essential to broadband networks" so long as the equipment "include[s] or use[s] electric components." *Supply Chain Second Report and Order* ¶ 52 (emphasis added). The Commission thus construed "essential to" to mean merely "used in." This

---

[2]  *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Second Report and Order, 35 FCC Rcd. 14284 (2020) ("*Supply Chain Second Report and Order*").

reads the Secure Networks Act's threshold requirement that equipment must be "essential to the provision of" "high-speed, switched broadband telecommunications capability" to reach virtually *all* electronic devices that *may* be connected to broadband networks.

The *Supply Chain Second Report and Order* also delegated authority to the Commission's Public Safety and Homeland Security Bureau to publish a Covered List and "update the Covered List in light of new or modified determinations." *Id.* ¶¶ 72–78. In March 2021, that Bureau announced a List including Petitioners' "[v]ideo surveillance and telecommunications equipment," but—consistent with Section 889—only "to the extent it is used for public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes . . . ."[3]

The Commission continued implementing the Secure Networks Act in the *Supply Chain Third Report and Order*, issued in July 2021.[4] The Commission indicated that recipients of federal funding "must remove and replace equipment and services" on the Covered List only if produced by companies designated as

---

[3] *See* FCC, List of Equipment and Services Covered By Section 2 of The Secure Networks Act, available at https://www.fcc.gov/supplychain/coveredlist (last updated Sept. 20, 2022).

[4] *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Third Report and Order, 36 FCC Rcd. 11958 (2021) ("*Supply Chain Third Report and Order*").

"pos[ing] a national security threat to the integrity of communications networks or the communications supply chain." *Supply Chain Third Report and Order* ¶ 37. "Because the Commission [had] only designated Huawei and ZTE as covered companies from the list of five companies found on the Covered List," recipients of federal funds were only required to remove and replace—and only reimbursed for removing and replacing—Huawei and ZTE equipment. *Id.* ¶¶ 37–39.

### C.     The Secure Equipment Act of 2021.

In June 2021, the Commission proposed new rules to prohibit *all* equipment on the Covered List from receiving an equipment authorization. *Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*, Notice of Proposed Rulemaking and Notice of Inquiry, 36 FCC Rcd. 10578 (2021) ("*June 2021 NPRM*"). The notice acknowledged that this step was "not specifically authorized by the Secure Networks Act," but asserted that the Commission may "rel[y] on the equipment authorization process to implement other statutory duties." *June 2021 NPRM* ¶ 65.

In November 2021, Congress passed the Secure Equipment Act, directing the Commission to "clarify" in this pending rulemaking that the Commission would "no longer review or approve any applications for equipment authorization for equipment that is on the [Covered List]." Secure Equipment Act of 2021, Pub.

L. No. 117-55, § 2(a)(2), 135 Stat. 423, 423.  The challenged *Order* implements this directive.

### D.    Sections 302 and 303 of the Communications Act.[5]

In addition to the statutes discussed above, both the *June 2021 NPRM* and the challenged *Order* rely on 47 U.S.C. Sections 302a and 303 as authority for barring Petitioners' equipment from the U.S. market.  These decades-old provisions authorize the Commission to regulate radio broadcasts and interference.

Section 302a addresses radio interference.  It was added to the Communications Act in 1968 "to give the [Commission] authority to prescribe regulations for the manufacture, import, sale, shipment, or use of devices which cause harmful interference to radio reception."  Communications Act of 1934, Pub. L. No. 90-379, § 302, 82 Stat. 290, 290 (codified as amended at 47 U.S.C. §§ 151 *et seq*.).  Before this, the Commission was not permitted to "prescribe regulations to require that devices . . . must be designed to avoid interference with radio communications"; it had to instead locate and address interfering devices on a "case-by-case basis."  H.R. Rep. No. 90-1108, at 2 (1968).  To obviate that cumbersome approach, "the new section [302a] . . . empowered the Commission, "consistent with the public interest, convenience and necessity, to prescribe

---

[5]    Section 302 is codified at 47 U.S.C. § 302a, so we generally refer to it as Section 302a.

reasonable regulations governing the interference potential of devices" capable of causing "interference to radio communications." *Id.* at 1. The Commission supported this legislation as "sufficiently broad to permit it to formulate rules relating to any service where interference from these devices is a serious problem." S. Rep. No. 90-1276, at 7 (1968).

As enacted, Section 302a authorizes the Commission to "make reasonable regulations . . . governing the interference potential of devices which in their operation are capable of emitting radio frequency energy . . . in sufficient degree to cause harmful interference" that are "consistent with the public interest, convenience and necessity." 47 U.S.C. § 302a(a). Section 302a(a) also authorizes the Commission to "establish[] minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy." *Id.* And Section 302a(b) essentially prohibits making or selling equipment that "fail[s] to comply with regulations promulgated pursuant to this section." *Id.* § 302a(b). Each of these provisions thus focuses on the Commission's regulatory authority to adopt measures to address *radio frequency emissions and interference* for devices.

Section 303, the main provisions of which were in the Communications Act as adopted in 1934, grants the Commission authority to regulate radio broadcasting. Subsections 303(a)–(d) allow the Commission to classify radio

17

stations and assign them specific bands and operation powers.  Section 303(e) allows the Commission to "[r]egulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein."  *Id*. § 303(b).  Section 303(f) further authorizes "such regulations not inconsistent with law as [the Commission] may deem necessary to prevent interference between stations and to carry out the provisions of this chapter," *id*. § 303(f), while Section 303(g) permits the Commission to "[s]tudy new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest."  *Id*. § 303(g).  In short, like Section 302a, Section 303 focuses on the Commission's authority over the radio frequency spectrum and radio frequency interference.

## III.    THE CHALLENGED ORDER.

The Commission released its *Order* on November 25, 2022.  The *Order* imposes three limitations on Petitioners' ability to import, market, and sell their equipment in the United States.

*First*, the *Order* prohibits *any* new authorizations for video surveillance equipment and telecommunications equipment produced by Petitioners, and their subsidiaries and affiliates, "for the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national

security purposes." *Order* ¶ 157.  Any such equipment is prospectively ineligible to receive the equipment certification necessary for importation, marketing, and sales in the United States. *Id*. ¶ 46.

*Second*, for any other equipment, the *Order* prohibits Petitioners from using the Commission's streamlined declaration process or using exemptions from authorization otherwise available under the rules.  Instead, Petitioners' equipment that is not prohibited outright must be authorized through the Commission's more cumbersome equipment certification process. *Id*. ¶ 78.

*Third*, as to Petitioners' equipment used for purposes *other than* public safety, security of government facilities, physical security surveillance of critical infrastructure, or other national security purposes, the *Order* requires each Petitioner to obtain Commission approval of a plan setting forth measures that will be taken to prevent marketing and sale of equipment for such purposes. *Id*. ¶ 180.

## SUMMARY OF ARGUMENT

**I.**  Under the Secure Networks Act, the Commission erred by subjecting Petitioners' video equipment to the Covered List restrictions for two separate reasons.  First, Congress limited the Covered List to communications equipment *essential* to the provision of broadband service—a category that does not include non-network equipment like Petitioners' video cameras and recorders.  Second, Congress limited the Covered List (and any restrictions thereunder) to

19

communications equipment that poses a national security threat to communications services—and the Commission never determined that Petitioners' equipment poses such a threat.

**A.**  Congress expressly limited the Covered List to "communications equipment or services" that are "essential to the provision of advanced communication service," which it defined to mean broadband service.  47 U.S.C. §§ 1601(a), 1608(4), 1302.  Petitioners' equipment does not meet that test.  It is not "essential" to the provision of broadband because broadband networks can and routinely do operate without video cameras or recorders.

The Commission did not conclude otherwise.  Instead, it misinterpreted "essential" to mean that Petitioners' video equipment need only be "used in" broadband networks.  But the ordinary meaning of "essential" requires that equipment be "absolutely necessary" to those networks, not merely "used in" them.  Moreover, Petitioners' equipment need not be, and often is not, connected to a broadband network.

**B.**  Congress also made clear that equipment may be subject to Covered List restrictions "if and only if" the requirements of Sections 1601(b)(1) "and" (b)(2) are satisfied.  By connecting these provisions with the word "and," Congress unambiguously required that *both* must be satisfied for equipment to be eligible for the Covered List and resulting restrictions.  Section 1601(b)(1) provides that

20

Congress or a national security agency must first determine that the equipment poses an unacceptable risk.  If Petitioners' equipment were essential communications equipment, this first condition would be satisfied by Congress' determination in Section 889(f)(3) that federal agencies may not purchase their equipment for certain purposes.

However, in Section 1601(b)(2), Congress separately required the Commission to determine that the equipment at issue is capable of posing a national security threat by, for example, misrouting data or remotely disrupting networks.  The Commission did not and could not make such a finding.  Instead, the Commission concluded that the requirements of Subsection (b)(2) were satisfied because the requirements of Subsection (b)(1) were satisfied.  That approach erroneously reads Subsection (b)(2) out of the statute.

**II.**  There is no merit to the Commission's alternative argument that it has authority to prohibit authorization of Petitioners' video equipment under the "public interest" language in 47 U.S.C. §§ 302a, 303.  Those decades-old provisions give the Commission authority to prevent interference with radio communications.  They cannot plausibly be stretched to give the Commission the power it now claims.  Indeed, if they stretched this far, there would be no limit to the Commission's power over electronic equipment, including things like laptops, smart refrigerators, and Wi-Fi-enabled televisions.

In addition, as the Supreme Court has frequently emphasized, a later-enacted, comprehensive statute that targets the specific subject matter at issue controls the construction of an older, more general statute. *Brown & Williamson Tobacco Corp.*, 529 U.S. 143. And the major-questions doctrine further counsels against reading old statutes as providing such a broad, previously undiscovered power. The Commission cannot end-run the requirements of the Secure Networks Act by discovering that Sections 302a and 303 empower it to prohibit Petitioners' equipment from authorization or unduly restrict such authorizations.

**III.** The Commission adopted an unlawful interpretation of "critical infrastructure" for purposes of Section 889, the Secure Networks Act, and the Secure Equipment Act. The Commission does not administer Section 889—which applies across the Federal government—and is not entitled to *Chevron* deference when interpreting its terms. The Commission's construction of "critical infrastructure" must be reviewed *de novo*.

The Commission's interpretation is untenable considering the statutory text, context, ordinary meaning, and congressional intent. The Commission interpreted "critical infrastructure" to include nearly the entire United States economy as critical infrastructure. But the text and context of the term make clear that it is properly interpreted to mean only infrastructure that is so vital that its degradation

22

would have a debilitating effect on national security.  If *everything* is "critical," then the term is meaningless.

## STANDING

Petitioners' video equipment requires Commission authorization before it can be imported, marketed, or sold in the United States.  The *Order* under review (1) prohibits Petitioners—by name—from obtaining new certifications for their equipment used for delineated purposes, (2) prohibits Petitioners from using the Commission's streamlined declaration process or using exemptions from authorization otherwise available to other manufacturers under the rules, and (3) requires Petitioners to obtain approval of onerous compliance plans before equipment not used for specified purposes will be authorized.  As the objects of agency action under review, which will financially harm them, the Petitioners' standing is indisputable.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).

## STANDARD OF REVIEW

In reviewing an agency's construction of a statute that it administers, courts first ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984).  Where "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress." *Id.* at 842–43.  The Court will, however, "find ambiguity only after exhausting ordinary tools of the judicial craft." *Mozilla Corp. v. FCC*, 940 F.3d 1, 20 (D.C. Cir. 2019).  If the Court does find ambiguity, the agency's construction must still be reasonable to be upheld at *Chevron* Step Two.  *Id.* at 19–20 (citing *Chevron*, 467 U.S. at 843).  The Court does not afford deference to an agency's interpretation of a statute that it does not administer, but instead reviews *de novo*. *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018).

Under the Administrative Procedure Act, the Court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  To survive review, the Commission's "action must be the product of reasoned decisionmaking [*sic*]"—the action "must be within its lawful authority, and 'the process by which it reaches that result must be logical and rational.'" *Farrell v. Blinken*, 4 F.4th 124, 137 (D.C. Cir. 2021) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

## ARGUMENT

## I.    THE *ORDER* EXCEEDS THE COMMISSION'S STATUTORY AUTHORITY UNDER THE SECURE NETWORKS ACT.

The heart of the *Order*'s reasoning is that Congress *required* the Commission to place Petitioners' equipment on the Covered List because the Secure Networks Act refers to Section 889, which prohibits federal agencies from

buying or funding certain of Petitioners' products.  The Commission found that this cross-reference means that "Congress . . . has identified as 'covered' equipment both 'telecommunications equipment' and 'video surveillance equipment' produced by these entities," so the Commission need not ask whether Petitioners' equipment meets the Secure Networks Act's other requirements. *Order* ¶¶ 168–169.  That view fundamentally misconstrues the plain language of the Secure Networks Act.

The Secure Networks Act provides that the Commission "shall place on" the Covered List "any communications equipment or service, *if and only if*" the equipment *both*

> (1) "is produced or provided by an[] entity" whose products are subject to four specified "determinations" that they "pose[] an unacceptable risk to the national security . . . ; *and*"

> (2) "is capable of" affecting network traffic in two specified ways or "otherwise posing an unacceptable risk to the national security . . . ."

47 U.S.C. § 1601(b) (emphasis added).

This language imposes three separate restrictions, which must *all* be satisfied before equipment can be placed on the Covered List and subject to restrictions thereunder.  First, only "communications equipment or service[s]" essential to the provision of broadband are eligible to be listed.  Second, eligible equipment must be produced by an entity subject to one of the four specified national security

25

determinations.  This is where Section 889 comes in:  One of the "determinations" is the "communications equipment or service being covered telecommunications equipment or services, as defined in section 889(f)(3)."  *Id.* § 1601(c)(3).  Third, the equipment must *also* be "capable of" the specified network-affecting functions.

Being named in Section 889 thus satisfies just one of the Secure Networks Act's three core criteria.  Equipment listed in Section 889 (or subject to any of the other specified national-security determinations) may be subject to the Covered List only if it *also* meets the statutory definition of "communications equipment or service" *and* has the requisite capabilities.  With respect to Petitioners' video products, the Commission both broadened the definition of "communications equipment or service" beyond recognition and collapsed the Act's second and third requirements, rendering part of the statute superfluous and ignoring Section 889's very different separate scope and purpose.

## A.    Only Equipment "Essential" to the Provision of Broadband Services Can Be Placed on the Covered List.

The Secure Networks Act directs the Commission to "publish on its website a list of covered communications equipment or services."  *Id.* § 1601(a); *see id.* § 1601(b).  The Act specifically defines "communications equipment or service" as "any equipment or service that is *essential to the provision of advanced communications service*."  *Id.* § 1608(4) (emphasis added).  "Advanced communication service" is in turn defined to have the same meaning as "advanced

telecommunications capability" in the Telecommunications Act, *id.* § 1608(1), which is "high-speed, switched, *broadband telecommunications capability* that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications," *id.* § 1302(d)(1) (emphasis added), and "does not include content." *In the Matter of Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in A Reasonable & Timely Fashion, & Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996*, Report, 14 FCC Rcd. 2398, 2407 ¶ 23 (1999). Thus, devices are only "communications equipment" potentially subject to the Covered List if they are *essential* to the provision of *broadband service,* and not if they merely generate or receive the content that may end up being carried over a broadband network.

This restriction reflects the Secure Networks Act's purpose "to secur[e] our Nation's telecommunications infrastructure." *Legislating to Secure America's Wireless Future*, Congress 3 (Sept. 27, 2019), https://www.congress.gov/116/meeting/house/109991/documents/HHRG-116-IF16-Transcript-20190927.pdf (preliminary transcript). Congress's core concern was the presence of "untrusted

equipment" from Huawei and ZTE in the telecommunications networks of "broadband providers."  165 Cong. Rec. H10282-01, at *H10285.[6]

Petitioners' video cameras and recorders, used primarily to provide security on private property, are not "essential" to the provision of broadband service. "Essential" means "[a]bsolutely necessary" or "indispensably requisite;" that is, "[o]f the utmost importance; basic and necessary."  *Essential, adj. and n.*, Oxford Eng. Dictionary, http://www.oed.com/view/Entry/64503 (last visited June 1, 2023); *Essential*, *Black's Law Dictionary* (11th ed. 2019).  So, equipment is "communications equipment" only if it is indispensable to the provision of broadband service—that is, if broadband service is not possible without it.  Of course, that is not true here.  Broadband networks do not need video cameras or recorders to function.  And non-network equipment like Petitioners' does not raise concerns about "telecommunications infrastructure" of the sort Congress aimed to address.

The Commission tried to avoid this problem by adopting an interpretation of "essential" unmoored from either ordinary meaning or statutory context.  The challenged *Order* relies on the *Supply Chain Second Report and Order*, which

---

[6]    The Secure Equipment Act, which the challenged *Order* directly implements, does not have definitions of its own.  It is based on the Covered List required by the Secure Networks Act and therefore reflects that Act's scope.

declared that "essential" equipment "include[s] all equipment or services *used in* fixed and mobile broadband networks, provided they include or use electronic components." *Supply Chain Second Report and Order* ¶ 52. According to the Commission, "all equipment or services that include or use electronic components can be reasonably considered essential to broadband networks." *Id.*

That makes no sense. "Used in" is not a reasonable—or even plausible— reading of "essential to." Put differently, not all "equipment or service[] that . . . use[s] electronic components" is *absolutely necessary* to broadband service. The Commission's definition would sweep in not only Petitioners' video cameras and recorders, but also consumer products like smart televisions and refrigerators. It is farcical to suggest that any of these devices are "essential to" "high-speed, switched, broadband telecommunications capability." The Commission watered down the statutory definition until it has no meaning.

In addition, the Commission's broad interpretation ignores the Covered List's initial purpose of identifying equipment that Congress was willing to pay small broadband providers to "rip and replace." *See* 47 U.S.C. § 1603. In the *Supply Chain Third Report and Order*, ¶ 37, the Commission correctly determined that Congress wanted only equipment posing "a national security threat to the integrity of communications networks or the communications supply chain" to be eligible for reimbursement. The Commission therefore found that Petitioners'

29

equipment is *not* eligible for reimbursement.  The challenged *Order*, in contrast, erred by failing to focus on the integrity of communications networks.  That focus would properly limit the Covered List to essential broadband equipment, like routers and base stations, and would not extend to peripheral equipment such as Petitioners' video equipment.

The Commission's view also overlooks Congress's use of different language in the relevant statutory provisions.  As Section 1601(a) provides, the Secure Networks Act governs only "*communications* equipment or services" (emphasis added).  In contrast, when addressing Petitioners' equipment in Section 889(f)(3), Congress spoke of "telecommunications or video surveillance equipment."  If Congress had intended to cover video equipment as well as communications equipment in the Secure Networks Act, it would have explicitly referred to "video surveillance" equipment.  Its failure to do so reinforces the conclusion that the Act is not addressed to peripheral, non-network equipment at all.  *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018) (Courts must "give effect to Congress' express inclusions and exclusions, not disregard them.").

For that matter, even the Commission's impermissibly broad redefinition does not reach as far as necessary to sustain the *Order*.  Video cameras and recorders generate content; they are not "used *in*" broadband networks at all, any

more than smart televisions or refrigerators are.[7]  At most, a smart refrigerator—or, here, a video camera—may be used *with* a broadband network; it plays no role in the *delivery* of broadband telecommunications services.

In sum, the Secure Networks Act unambiguously limits the Covered List to equipment that is essential to the provision of broadband services.  The Commission was apparently unsatisfied with that limit, so it defined it out of existence.  The agency also ignored Congress' fundamental purpose in adopting the Secure Networks Act—securing the nation's broadband networks.  That goal does not implicate customer-premises equipment like video cameras.  Because Petitioners' products fall outside the statutory definition of "communications equipment or service," they cannot be subject to Covered List restrictions, whether or not they would meet the other statutory criteria.

### B.  Covered List Restrictions Do Not Apply to Petitioners' Video Equipment Just Because It Is Identified in Section 889.

Not all "communications equipment" may be placed on the Covered List.  Congress specified that equipment may be included "if and only if" it also satisfies the Secure Networks Act's other two requirements—the national-security determinations required by paragraph (b)(1) and the capability requirement in

---

[7]  Comments of Hikvision USA, Inc. at 38–39, ET Docket No. 21-232 (filed Sept. 22, 2021).

paragraph (b)(2).  The *Order* concludes that *both* requirements are satisfied because "'covered' equipment for purposes of the Secure Networks Act" includes all equipment that was subject to "the determination made by Congress in [Section 889]," including Petitioners' video equipment.  *Order* ¶ 121.  That is only half right.  For equipment that qualifies as "communications equipment or service," inclusion in Section 889 satisfies the national-security determination requirement, but *not* the separate capability requirement.

Section 889 and the Secure Networks Act are separate statutes with separate purposes.  Section 889 is about how the government spends its own money—it prohibits federal government agencies from purchasing or subsidizing *any* "telecommunications or video surveillance equipment" that is either specifically identified in the statute or reasonably believed by the Secretary of Defense to be "connected to" the government of a covered foreign country.

The Secure Networks Act's scope is different.  It covers only "essential" network equipment that could pose a national security threat when used in broadband networks.  That is why the Act includes a more limited definition of "communications equipment or service."  In other words, the Secure Networks Act gathers up all the equipment subject to various national-security determinations— including equipment specified in Section 889—and then asks whether any of it

warrants restriction under the Covered List based on the Act's *additional* criteria.

Merely being identified in Section 889 is not enough.

This is clear from the statutory text and structure. Again, any

communications equipment or service may be listed "if and only if" it:

> (1) is produced or provided by an entity, if, based exclusively on the determinations described in . . . subsection (c), such equipment . . . poses an unacceptable risk to the national security of the United States . . . ; ***and***
>
> (2) is capable of—
>
>> (A) routing or redirecting user data traffic or permitting visibility into any user data or packets that such equipment or service transmits or otherwise handles;
>>
>> (B) causing the network of a provider of advanced communications service to be disrupted remotely; or
>>
>> (C) otherwise posing an unacceptable risk to the national security of the United States . . . .

47 U.S.C. § 1601(b) (emphasis added). This language is unambiguous:

Communications equipment may be restricted under the Covered List only if it

satisfies the separate criteria of both paragraphs (b)(1) *and* (b)(2).

Being identified in Section 889 can thus satisfy the Secure Networks Act's

second criterion—but only that one. Paragraph (b)(1) incorporates "the

determinations described in . . . subsection (c)," one of which is the

"*communications equipment or service being* covered telecommunications

equipment or services, as defined in section 889(f)(3)." *Id.* § 1601(c)(3) (emphasis

added).  So, products described in Section 889 that meet the Secure Networks Act's definition of "communications equipment or service" necessarily satisfy paragraph (b)(1)'s national-security-determination requirement.  But they still cannot be restricted unless they *separately* satisfy paragraph (b)(2)'s capability requirement, which means that they must be capable of routing traffic, disrupting a network remotely, or "otherwise posing an unacceptable risk to the national security of the United States or the security and safety of United States persons." *Id.* § 1601(b)(2)(C).

The Commission never made any finding that Petitioners' equipment has any of the capabilities identified in paragraph (b)(2).  In fact, the Commission expressly disavowed any obligation to do so.  *Order* ¶ 169.  According to the Commission, "in effect, Congress under § 889(f)(3) . . . has made that capability determination pursuant to [subparagraph] (b)(2)(C)" by supposedly determining that Petitioners' products are "capable of 'otherwise posing an unacceptable risk' to national security."  *Id.*  In other words, the Commission concluded that every national-security determination under paragraph (b)(1) necessarily satisfies paragraph (b)(2) as well, by establishing the capability of "'otherwise posing an unacceptable risk' to national security."

That interpretation reads paragraph (b)(2) out of the statute.  If a paragraph (b)(1) determination always satisfied subparagraph (b)(2)(C), then paragraph (b)(2)

as a whole would serve no purpose.  The Commission's view thus violates the basic rule of statutory construction that the Court will not "interpret[] one provision in a way that renders another redundant."  *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting *Fla. Health Scis. Ctr, Inc. v. Sec'y of Health & Humans Servs.*, 830 F.3d 515, 520 (D.C. Cir. 2016)).  A court must "give effect, if possible, to every word Congress used," and should "reject[] an interpretation of [a] statute that would render an entire subparagraph meaningless." *Nat'l Ass'n of Mrfs.*, 138 S. Ct. at 632 (citation omitted).  And "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).  Yet, according to the *Order*, paragraph (b)(1) makes the adjacent paragraph (b)(2) redundant.

The Commission's interpretation is particularly implausible given that Congress in paragraph (b)(2) carefully identified particular technical capabilities that warrant restriction under the Covered List: "routing or redirecting user data traffic," "permitting visibility into any user data or packets," or "causing the network of a provider of advanced communications service to be disrupted remotely."  47 U.S.C. § 1601(b)(2)(A)–(B).  Yet in the Commission's view, these specific provisions are pointless—it would *never* matter if a device were capable of routing data or disrupting a network, because every national-security determination

35

under paragraph (b)(1) would trigger subparagraph (b)(2)(C)'s generic catch-all provision.

For similar reasons, the Commission's reasoning violates the canon of *ejusdem generis*, which provides that general statutory terms following a specific list are limited to objects similar to the listed terms. *Yates v. United States*, 574 U.S. 528, 545 (2015). Relatedly, under the canon of *noscitur a sociis*, "a word is known by the company it keeps," and a court should not "ascrib[e] to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to Acts of Congress." *Id.* at 543 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).

Section 1601(b)(2) lists three criteria. The first two are specific to a device's ability to cause some harm through interaction with a network—either by intercepting data or disrupting traffic. And these are matters as to which the Commission has relevant expertise. The third criterion—"otherwise posing an unacceptable risk" to national security, 47 U.S.C. § 1601(b)(2)(C)—is not described with precision, but two preceding criteria provide clarity about its scope: it must be related to a device's ability to interact harmfully with a network. A broader construction would not make sense, both (1) because it would be illogical for Congress to carefully delineate two network security concerns only to create a

36

third category that completely swallows the first two, and (2) because the Commission has no expertise to assess broader national-security threats.

To be sure, the "unacceptable risk" language in subparagraph (b)(2)(C) also appears in paragraph (b)(1), which is apparently why the Commission believed a national-security determination under paragraph (b)(1) also satisfies paragraph (b)(2). But that reading not only renders paragraph (b)(2) superfluous in every application, as just explained; it also assumes that Congress wrote the same substantive requirement into separate statutory provisions joined by the word "and." To be listed, equipment must be subject to a determination under paragraph (b)(1) "*and* (2) [be] capable of" the effects described in paragraph (b)(2). *Id.* § 1601(b)(1)–(2) (emphasis added). The plain meaning of "and," however, is conjunctive. When used to join multiple requirements in a statute or rule, "and" means "each of the [listed] particulars" must be satisfied, *see, e.g.*, *Cruz v. Am. Airlines, Inc.*, 193 F.3d 526, 529 (D.C. Cir. 1999)—which necessarily means there must be *separate* requirements for "and" to conjoin. It is not plausible that Congress allowed communications equipment to be restricted under the Covered List "only if" it meets requirements (1) "*and*" (2), yet framed these requirements so they are the same.[8]

---

[8]  While this means the "unacceptable risk" language carries different meanings in paragraph (b)(1) and subparagraph (b)(2)(C), the presumption that a term means

37

This conjunctive reading also makes sense in terms of the overall structure of the statute. Congress required the Commission to rely on national security determinations made by Congress or national security agencies, but required the Commission to *also* determine (under Section 1601(b)) that equipment poses more specific risks *to broadband networks* in order to be restricted. The Commission has not made *any* finding that Petitioners' video security devices pose any "unacceptable security risk" to broadband networks, whether for the reasons enumerated in Section 1601(b)(2)(A) and (b)(2)(B), or for any unenumerated reason under Section 1601(b)(2)(C). Because the Commission has made *no* findings under Section 1601(b)(2)—and, again, has disavowed the need for any such findings, *see Order* ¶169—its restrictions for Petitioners' products violate the express requirements of the Secure Networks and Secure Equipment Acts.

Moreover, the Commission *cannot* reasonably make any finding that Petitioners' video cameras and recorders satisfy Section 1601(b)(2). First, Petitioners' cameras and recorders are *not* generally "capable of . . . routing or redirecting user data traffic or permitting visibility into any user data." 47 U.S.C. § 1601(b)(2)(A). Like a telephone, cameras merely generate the data that is

---

the same thing whenever it appears in a statute "readily yields to context," *Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1863 (2019), and the contexts of paragraph (b)(1) and subparagraph (b)(2)(C) differ significantly.

routed, if at all, by other devices in the end user's network, which the end user

controls.  And a video camera cannot "caus[e] the network of a provider of

advanced communications service to be disrupted remotely."  *Id.* § 1601(b)(2)(B).

Petitioners' equipment, again, is customer premises equipment, operating on the

*end user's* enterprise network, not in the broadband provider's network, and

accordingly has *no* ability to disrupt the nation's broadband infrastructure.

In turn, Petitioners' equipment also cannot trigger Section 1601(b)(2)(C)'s

catch-all.  Under Section 1601(b)(2)(C), the focus is on the capabilities of the

*equipment* rather than the company.  Consistent with the canon of *ejusdem generis*

discussed above, the issue under Section 1601(b)(2)(C) is whether the devices have

*characteristics* enabling them to be used to attack the U.S. telecommunications

infrastructure.  Petitioners' video cameras and recorders do not—but again, the

even more important point is that the Commission has made no finding that they

do.

In addition, the Commission is wrong to suggest that Section 1601(c)

independently grants authority to place devices on the Covered List without

meeting all the requirements of Section 1601(b).  *See Order* ¶ 133, n.313.  Section

1601(c) says that the Commission "shall place" equipment—including that covered

by Section 889—on the Covered List "in taking action under subsection (b)(1)."

47 U.S.C. §1601(c).  Subsection (c) simply lists the determinations that satisfy

paragraph (b)(1); it does not provide an independent avenue to evade the rest of subsection (b)'s requirements.  And if it did, paragraph (b)(2) would again be a dead letter since the Commission could always just proceed under subsection (c).  That is not what the statute provides.

Finally, the Commission's total reliance on the cross-reference to Section 889 overlooks that even Section 889 itself exempts equipment that lacks the capability to affect network traffic.  Section 889 does not bar federal agencies from purchasing "telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles."  Section 889(a)(B), (b)(2)(3)(B).  As explained above, the equipment at issue does not have such capabilities and therefore is not within Section 889's prohibition.  It would make no sense to conclude that the cross-reference to Section 889 in the Secure Networks Act prohibits the Commission from certifying the equipment at issue for private use when Congress has not even barred federal agencies from using the equipment.

## II.    THE ORDER EXCEEDS THE COMMISSION'S AUTHORITY UNDER TITLE III OF THE COMMUNICATIONS ACT.

The challenged *Order* proposes a vast expansion of the Commission's authority under Title III of the Communications Act.  Although the Commission invokes Sections 302a and 303, these provisions merely authorize regulation of the radio frequency spectrum and of devices' potential to interfere with radio

frequencies.  They do not authorize freewheeling "public interest" regulation of non-network devices for reasons untethered to radio frequency management.

In 1934, Congress enacted the Communications Act "[f]or the purpose of regulating … communication by wire and radio."  47 U.S.C. § 151.  Section 303 authorized the Commission to (among other things) regulate radio stations and prohibit the use of devices that interfere with radio communications.  But it originally required the Commission to "proceed on a case-by-case basis to locate devices which cause radio interference and stop such interference."  H.R. Rep. No. 90-1108, at 2.  The Commission thus had to chase down individual devices creating radio interference and prohibit their use.

In 1968, Congress therefore enacted a new Section 302a to give the Commission the ability to prospectively prevent harmful interference by "prescrib[ing] regulations for the manufacture, import, sale, shipment, or use of devices which cause harmful interference to radio reception."  § 302, 82 Stat. at 290.  Section 302a—captioned "Devices which interfere with radio reception"— empowers the Commission, "consistent with the public interest, convenience, and necessity," to "make reasonable regulations (1) governing the interference potential of devices" capable of emitting radio frequency energy "and (2) establishing minimum performance standards" for devices to reduce their susceptibility to radio frequency interference.  47 U.S.C. § 302a(a).  As this

41

language makes clear, the Commission's regulations under Section 302a can do only two things—"govern[] [radio frequency] interference potential" and "establish[] minimum performance standards" to address the same concern.

The challenged *Order*, however, reads the phrase "consistent with the public interest"—which merely *qualifies* the Commissioner's power to make the two specific kinds of rules named in Section 302a—as creating an "independent authority" to make rules in the public interest, including to address (hypothetical and unsubstantiated) "national security concerns" that have nothing to do with the radio-frequency spectrum. *Order* ¶¶ 40, 55. The Commission thus views Section 302a as allowing it to bar Petitioners' products even though it does not claim they present any radio-frequency concerns or violate any rules on the subject.

That is not what the statute says. If the Commission's reading were right, Section 302a(a) would simply say "The Commission may, consistent with the public interest, convenience, and necessity, make reasonable regulations," period. By instead specifying two particular objects at which those regulations must be aimed, Congress foreclosed such unbounded authority. Indeed, in the Commission's view, it doesn't matter what the rest of Section 302a says—the statute could say "The Commission may, consistent with the public interest, convenience, and necessity, make reasonable regulations providing a dress code

42

for Commission employees" and the agency's textual argument would be the same. That is not how statutory interpretation works.

And even setting aside Section 302a's specific limiting language, the Commission's view clashes with the doctrine that a later-enacted, more specific statute controls the application of an older, more general statute to the same subject. *See Brown & Williamson Tobacco Corp.,* 529 U.S. 143. Construing Section 302a to let the Commission enact limitations on authorization of equipment *regardless* of the Secure Networks Act's restrictions "would allow the [agency] to circumvent the detailed regulatory scheme, including express constraints, set forth by Congress" in the later legislation. *See Nutritional Health All. v. FDA*, 318 F.3d 92, 104 (2d Cir. 2003).

The Commission's reading of Section 302a also cannot be right because it has no limiting principle. The *Order* focuses on supposed national-security concerns, *Order* ¶¶ 40, 55, but Section 302a does not mention national security; it refers to "the public interest, convenience, and necessity." 47 U.S.C. § 302a(a). So, if this clause conferred a free-standing rulemaking power, then suddenly— decades after Section 302a's enactment—the Commission would have an apparently limitless regulatory authority over electronic devices and their manufacturers. But the Supreme Court has often made clear that Congress does not delegate such "sweeping and consequential authority" in "cryptic [] fashion."

43

*West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022). And the Court has repeatedly rebuffed agencies that, like the Commission here, "claimed to discover [in a long-extant statute] an unheralded power representing a transformative expansion of [their] regulatory authority." *Id.* (cleaned up). In short, the Commission cannot rely on a single clause in a decades-old provision about radio-frequency interference to assert "regulatory power over a significant portion of the American economy" that has "never before been subject" to such power. *Id.* (cleaned up).

Likewise, if the Commission were right, its sweeping authority under Section 302a would apparently justify any regulation of equipment, including the broadcast flag requirements this Court rejected in *American Library Association*. There, the Commission tried to require digital television receivers to be manufactured with the capability to prevent unauthorized redistributions of digital content by recognizing a "broadcast flag" embedded in previously broadcasted content. *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 691 (D.C. Cir. 2005). This Court noted that proponents of the regulation had, before the Commission, invoked the Commission's "express statutory authority" under Title III to issue new licenses for advanced television services. *Id.* at 694. But it is telling that the Commission itself did *not* invoke Section 302a's "public interest" language as a source of statutory authority for the challenged regulation. If Section 302a were to provide—as the Commission now claims—general "public interest" regulatory

44

authority over electronic devices, that would certainly have justified the broadcast flag rules that this Court invalidated as lacking statutory authorization.[9]

The challenged *Order* also makes a passing reference to the Commission's authority pursuant to Section 303(e) to "[r]egulate the kind of apparatus to be used with respect to its external effects" and the purity and sharpness of the emissions from each station and from the apparatus therein. *Order* ¶ 41 (internal quotation marks omitted). But again, Section 303 does not grant the Commission sweeping authority to enact regulations based on "external effects" alone. The Commission's assertion of plenary authority to regulate any "external effects" of any "apparatus" ignores the remainder of Section 303(e), which is plainly focused on the *electromagnetic emissions* of the apparatus. Moreover, if this provision allowed the Commission to regulate based on *any* kind of "external effect," Congress would never have had to enact Section 302a.

---

[9] The *Order*'s novel understanding of Title III would also eviscerate an array of ancillary authority precedents. *See Comcast Corp. v. FCC*, 600 F.3d 642, 653 (D.C. Cir. 2010) (quoting *NARUC v. FCC*, 533 F.2d 601, 612 (D.C. Cir. 1976) (ancillary authority is "incidental to, and contingent upon, specifically delegated powers under the Act"); *see also Mot. Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 806–07 (D.C. Cir. 2002) (cleaned up) (rejecting the Commission's "argument that [its] video description rules are obviously a valid communications policy goal and in the public interest" because the Commission "can point to no statutory provision that gives the agency authority" to issue those rules).

The Commission cannot avoid these problems by claiming the Secure Equipment Act "ratif[ies] the Commission's . . . authority" to adopt the provisions of the *Order* under Title III.  *Order* ¶ 42.  The Act directs the Commission to "clarify" that it will no longer review or approve applications for equipment on the Covered List.  It does not address what equipment is properly on the Covered List to begin with.

## III.    THE COMMISSION'S INTERPRETATION OF "CRITICAL INFRASTRUCTURE" IS CONTRARY TO LAW.

Even assuming Petitioners' equipment belongs on the Covered List at all, the *Order* sweeps far too broadly.  Section 889 covers Petitioners' "video surveillance and telecommunications equipment" to the extent it is used "[f]or the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes[.]"  Section 889(f)(3)(B).  Although the Commission purported to respect this facial "use" limitation,[10] the Commission's interpretation of "critical infrastructure" eviscerates the statutory limits and contravenes Congressional intent by treating nearly all aspects of the economy as "critical infrastructure."

---

[10]    *See Order* ¶ 176 (noting that the Commission "cannot expand 'covered' . . . by adopting a blanket or categorical prohibition on authorizing equipment produced by these entities for those other purposes").

A.    **The Commission's Interpretation of "Critical Infrastructure" Is Not Entitled to Chevron Deference.**

The *Order* recognizes that the term "critical infrastructure" in Section 889 limits the Commission's ability to prohibit authorization of Petitioners' equipment. *See Order* ¶¶ 176–77.  But while the *Order* interprets this statutory term, the Commission does not administer Section 889—and even if it did, it would lack authority to define this term for all the other parts of the government to which Section 889 applies.  As such, this Court owes the Commission's interpretation no deference.

An agency's statutory interpretation receives deference only if Congress delegated authority to that agency to administer the statute.  *See Epic Sys. Corp.*, 138 S. Ct. 1629 (no deference due where National Labor Relations Board sought to interpret the Federal Arbitration Act, which it does not administer); *see also Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1279 n.5 (D.C. Cir. 2004) (no *Chevron* deference owed where the Food and Drug Administration was not charged with administering a patent statute provision).

The only statute with *any* connection to the *Order* that contains the term "critical infrastructure" is Section 889.  There, Congress used the term to define the scope of Petitioners' "covered telecommunications equipment and services" subject to federal government procurement and contracting prohibitions administered by agencies other than the Commission (the General Services

47

Administration, Department of Defense, and National Aeronautics and Space

Administration).  But no provision in Section 889 empowers the Commission to

administer or implement these procurement provisions.  Indeed, the only mention

of the Commission in Section 889 appears in a provision requiring it and other

agencies to assist businesses impacted by the procurement provisions of the statute

to replace covered communications equipment and services.  *See* Section

889(b)(2).  Neither that provision nor any other in Section 889 grants the

Commission authority to interpret or administer the procurement restriction

incorporating the "critical infrastructure" limitation.  *Compare Scheduled Airlines*

*Traffic Off., Inc. v. Dep't of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996) (finding

*Chevron* deference "inappropriate" and *de novo* review "appropriate" where the

Department of Defense "has not been entrusted to administer, and thus has no

authority to interpret" the relevant statute), *with United States v. Mead Corp.*, 533

U.S. 218, 226–27 (2001) (*Chevron* deference applies to agency interpretation

promulgated in the exercise of delegated authority to make rules carrying the force

of law.).

Nor does the Secure Networks Act's cross-reference to Section 889

empower the Commission to administer the "critical infrastructure" provision.

First, the Secure Networks Act affirmatively *prohibits* the Commission from

exercising any discretion in applying the designations made by Section 889(f)(3).

48

*See* 47 U.S.C. § 1601(c) (emphasis added) ("In taking action under subsection (b)(1), the Commission *shall* place on the list any communications equipment or service . . . *based solely on* one or more . . . determinations" including Section 889(f)(3)).  In applying the designations made by Congress or national-security agencies to equipment that meets the Act's other requirements, the Commission's task is effectively ministerial.[11]  Congress thus plainly did not intend to delegate the Commission any authority to interpret Section 889(f)(3)(B).

But even if the Commission had limited implementation authority under Section 889, deference here would still be improper.  As noted above, several other agencies directly administer Section 889's procurement restrictions.  Deferring to the Commission would subject those agencies to the Commission's unilateral interpretation.  That result would let the tail wag the dog by elevating the Secure Networks Act's cross-reference to Section 889 over Section 889's own provisions.  And it would also violate this Court's precedents denying deference to agency interpretation of the Administrative Procedure Act ("APA") and other laws that apply across agencies.  *See, e.g.*, *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir 2014) (reviewing *de novo* the Commission's legal conclusion

---

[11]  The Commission acknowledged this in its initial *Order* establishing a process to maintain the Covered List, noting that the Secure Networks Act provides the agency "no discretion to disregard determinations" from the sources enumerated in the Act.  *See Supply Chain Second Report and Order* at 14312.

regarding the notice-and-comment good cause exception because "an agency has no interpretive authority over the APA"); *see DeNaples v. Off. of Comptroller of the Currency*, 706 F.3d 481, 487 (D.C. Cir. 2013) (recognizing distinction in deference owed in context of generic statutes like the APA and FOIA and statutes providing mutually exclusive authority over regulated persons); *Fed. Lab. Rel. Auth. v. U.S. Dep't of Treasury*, 884 F.2d 1446, 1451 (D.C. Cir. 1989) (reviewing *de novo* and declining to defer to agency's Freedom of Information Act and Privacy Act interpretations because the agency "is not charged with a special duty to interpret either" law).

### B. The Commission's Interpretation of "Critical Infrastructure" Is Contrary to the Term's Ordinary Meaning, Statutory Context, and Congressional Intent.

The Commission misinterpreted "critical infrastructure" to include far more than that term can bear. The term is properly interpreted to mean only infrastructure that is so vital that its degradation would have a debilitating effect on national security. The Commission erred by instead interpreting the term to include anything that is in some way connected to one of many sectors of the economy that have some connection to national security. Under the Commission's approach, all infrastructure is critical, including laundromats and used car lots. But if *everything* is "critical," then nothing is.

The term "critical infrastructure" in Section 889(f)(3)(B) *limits* how Section 889's other provisions apply to Petitioners' equipment and services. Congress defined Petitioners' "covered" equipment and services as:

> [f]or the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

Section 889(f)(3)(B). In contrast, as to certain other companies, the definition encompasses "[t]elecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities)." Section 889(f)(3)(A). Since the provision addressing Petitioners' equipment is restricted by the prefatory "[f]or the purpose of" language, while the provision addressing other companies is not, Congress made clear its intention to limit, not expand, the scope of "covered" equipment with respect to Petitioners.

And the scope of that limitation is clear from both how Congress uses the term "critical infrastructure" elsewhere and the ordinary meaning of "critical." Other statutes use the term "critical infrastructure" to denote a relatively narrow class of the most important and valuable national assets; not any facility, business, or item that has any conceivable "connect[ion]" to "critical" sectors or functions. "When Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same

51

meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005).  As

the Commission itself recognized, Congress defined the term in the USA

PATRIOT Act of 2001 ("Patriot Act") to include "systems and assets, . . . *so vital*

to the United States" that "incapacity or destruction … would have a *debilitating*

*impact* on security, national economic security, national public health or safety, or

any combination[.]"  42 U.S.C. § 5195c(e) (emphasis added).  Virtually identical

definitions are found in several other statutes.  *See* 10 U.S.C. § 2224 stat. note

Evaluation of Cyber Vulnerabilities of Department of Defense Critical

Infrastructure (defining "critical infrastructure of the Department of Defense"); 50

U.S.C. § 4552(2); 23 U.S.C. § 119(j).  None of these statutes sweeps in all

"related" or "connected" systems or assets by category or function.

　　　　Moreover, in Section 1703 of the same Act that contains Section 889—the

2019 National Defense Authorization Act—Congress defined "critical

infrastructure" as meaning "subject to regulations prescribed by the Committee [on

Foreign Investment in the United States], systems and assets, whether physical or

virtual, so vital to the United States that the incapacity or destruction of such

systems or assets would have a debilitating effect on national security."  John S.

McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No.

115-232, § 1703(a)(5), 132 Stat. 1636.  The Committee then prescribed regulations

in 31 C.F.R. § 800, repeating the statutory definition and including an Appendix

specifically listing "critical infrastructure" systems and assets, such as "[a]ny internet exchange point that supports public peering," 31 C.F.R. § 800, App. A (ii), "[a]ny submarine cable system requiring a license," *id*. § 800, App. A (iii), or "[a]ny system, including facilities, for the generation, transmission, distribution, or storage of electric energy comprising the bulk-power system," *id*. § 800, App. A (xi). These are the kinds of infrastructure that *are* truly critical, and it defies logic to assume—as the Commission did in the *Order*—that Congress meant "critical infrastructure" in Section 889 to mean something different, and far broader,[12] than it meant in Section 1703 of the same Act.

Courts have also recognized that the President's designation of economic sectors as containing critical infrastructure does not logically imply that every facility within that broad sector is "critical." For example, in considering the implications arising from "critical" designations during the COVID-19 pandemic, the Third Circuit rejected the notion that Congress "deputize[d]" all private sector "doctors, weather forecasters, clergy, farmers, bus drivers, plumbers, dry cleaners, and many other workers" through critical infrastructure designations. *Maglioli v.*

---

[12]  Notably, Appendix A also contains specific narrowing language as to certain items, such as for "any individual refinery with the capacity to produce 300,000 or more barrels per day . . . of refined oil or gas products." 31 C.F.R. § 800, App. A (xv)(a). The Committee thus expressly recognized—unlike the Commission here—that not everything in a sector is "critical."

*All. HC Holdings LLC*, 16 F.4th 393, 406 (3d Cir. 2021). The Fifth Circuit likewise observed that "[e]verything from banks and auto-repair shops to hotels and dentists received the same designation." *Glenn v. Tysons Foods, Inc.*, 40 F.4th 230, 233 (5th Cir. 2022). Even if an industry is "critical" in a general sense, this does not mean that "every entity [or system or asset] within it" meets the same standard. *See Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 740 (8th Cir. 2021). *See also Mitchell v. Advanced HCS, LLC*, 28 F.4th 580, 590 (5th Cir. 2022) (emphasis in original) (noting that a broad reading would include "all *lawyers*" within the designations).

Congress's definition, and the views of courts considering similar terms, accord with the ordinary meaning of "critical." "Critical" means "[v]ery important or significant" or "crucial" or "indispensable, vital" or "decisive." Oxford English Dictionary, https://www.oed.com/view/Entry/44592 (last visited June 2, 2023); Merriam-Webster, https://www.merriam-webster.com/dictionary/critical (last visited June 2, 2023). Thus, the text, statutory context, and ordinary meaning all support a narrow interpretation that comprises only truly vital infrastructure.

The Commission, however, went in the opposite direction. It wrongly conflated multiple definitions of "critical infrastructure" from different sources, without considering how they fit together or apply here. The Commission first pointed to the Patriot Act's definition of "critical infrastructure" noted above. *See*

42 U.S.C. § 5195c(e). Although that may be an appropriate starting point, the Commission did not stop there. It cited sixteen critical infrastructure "sectors" identified in Presidential Policy Directive 21 including "commercial facilities," "food and agriculture," "information technology" and others,[13] and fifty-five "National Critical Functions" identified by the Cybersecurity and Infrastructure Security Agency's National Risk Management Center to guide risk management efforts, including functions such as "Educate and Train," "Provide Housing," and "Support Community Health." *See Order* ¶ 212.[14] After referencing these lists— but without analyzing how they were compiled or what they signified—the Commission opined that "*any systems or assets*, physical or virtual, *connected to*" any "sector" or "function" of the economy on either list "*could reasonably be considered* 'critical infrastructure.'" *Id*. (emphasis added).

---

[13]    Presidential Policy Directive 21 identifies sixteen critical infrastructure sectors: chemical, commercial facilities, communications, critical manufacturing, dams, defense industrial base, emergency services, energy, financial services, food and agriculture, government facilities, health care and public health, information technology, nuclear reactors/materials/waste, transportation systems, and water/wastewater systems.

[14]    The Commission observed that the Cybersecurity and Infrastructure Security Agency defines "critical infrastructure" "similar to how that term is defined in the USA Patriot Act" (i.e., "functions of government and the private sector so vital to the United States that their disruption, corruption, or dysfunction would have a debilitating effect on security, national economic security, national public health or safety, or any combination thereof"). *Order* ¶ 212. But the Commission apparently did not feel bound or guided by this consistency in definitional approach.

It strains credulity to claim that *all* commercial facilities—even laundromats—are "so vital" that their degradation or destruction would have *any* impact on national security, let alone a "debilitating" one. But that is exactly what the Commission's interpretation would require. By departing from the consistently used meaning of the term "critical," the Commission usurped authority that Congress never granted it.

Indeed, the Commission's interpretation effectively reads "critical" out of the statute, leaving only "infrastructure." To give full effect to all statutory language, *see U.S. v. Menasche*, 348 U.S. 528, 539 (1955), the word "critical" must concretely limit the scope of "covered" equipment. Without that word, the statute would have covered any of Petitioners' equipment that is used for physical security of any infrastructure. But the adjective "critical" requires that the statute apply to a narrower set of uses, so the statute distinguishes "critical" from other infrastructure. The Commission's contrary view violates basic interpretive principles. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012).

The implausibility of the Commission's interpretation is evident when brought to its logical conclusion. As the Commission would have it, coffee shops, residential apartment buildings, used car lots, and dry-cleaning stores all would be

56

"critical infrastructure" because they could be considered "systems or assets" that are in some way "connected to" one of the sixteen critical infrastructure sectors identified in Presidential Policy Directive 21 or the fifty-five National Critical Functions.  That makes no sense.

Finally, even if *Chevron* principles were to apply, the Commission's interpretation of Section 889 would be an unreasonable, arbitrary and capricious, and illogical interpretation that cannot stand.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (internal quotations omitted) ("Even under *Chevron's* deferential framework, agencies must operate within the bounds of reasonable interpretation."); *Judulang v. Holder*, 565 U.S. 42, 53 n.7 (2011) ("[U]nder *Chevron* step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance.'").  Even setting aside its patent overbreadth, the Commission provided no basis for its conclusion that all of these "systems or assets" are reasonably considered critical infrastructure.  It merely claimed— without pointing to any statutory or other directive from Congress—that the "purpose" limitations of Section 889(f)(3)(B) "are each construed broadly in order to prohibit authorization of equipment that poses an unacceptable risk to national security of the United States or to the security or safety of U.S. persons."  *Order* ¶ 209.  Thus, the Commission's interpretation is substantively unreasonable because it exceeds the bounds of any ambiguity in the statute, produces illogical

results, and is procedurally improper because it lacks any reasoned justification or explanation.  *See Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993) (remanding a rule where an agency offered only a "conclusory statement" of the agency's belief).

**CONCLUSION**

For all of the foregoing reasons, the Court should hold unlawful and set aside the *Order*.

Dated: June 8, 2023                       Respectfully submitted,

                                          /s/ Christopher J. Wright

Andrew D. Lipman                          Christopher J. Wright
Russell M. Blau                           Timothy J. Simeone
MORGAN, LEWIS & BOCKIUS LLP               John T. Nakahata
1111 Pennsylvania Ave NW                  John R. Grimm
Washington, DC 20004                      Deepika H. Ravi
(202) 739-3000                            Annick Banoun
andrew.lipman@morganlewis.com             HWG LLP
russell.blau@morganlewis.com              1919 M St. NW, 8th Floor
                                          Washington, DC 20036
*Counsel to Dahua Technology USA,*        (202) 730-1300
*Inc.*                                    cwright@hwglaw.com

James M. Cole
Tobias S. Loss-Eaton
Sidley Austin LLP
1501 K St. NW
Washington, DC 20005
(202) 736-8000
tlosseaton@sidley.com

*Counsel to Hikvision USA, Inc.*

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font.  I further certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 12,486 words according to the word-count feature of Microsoft Word.

/s/ Christopher J. Wright
Christopher J. Wright

## CERTIFICATE OF SERVICE

I certify that on this 8th day of June 2023, the foregoing brief was filed via

CM/ECF.  Service was accomplished on all parties or their counsel of record via

CM/ECF.

/s/ Christopher J. Wright
Christopher J. Wright

# STATUTORY AND REGULATORY ADDENDUM

# Table of Contents

Document
Page

31 C.F.R. § 800 ................................................................................. Stat. Add. 2

47 C.F.R. § 2.901 ............................................................................. Stat. Add. 3

5 U.S.C. § 706 ................................................................................. Stat. Add. 4

10 U.S.C. § 2224 ............................................................................. Stat. Add. 5

23 U.S.C. § 119 ............................................................................... Stat. Add. 8

28 U.S.C. § 2342(1) ...................................................................... Stat. Add. 18

42 U.S.C. § 5195(c) ...................................................................... Stat. Add. 19

47 U.S.C. § 151 ............................................................................. Stat. Add. 20

47 U.S.C. § 302a ........................................................................... Stat. Add. 21

47 U.S.C. § 303 ............................................................................. Stat. Add. 22

47 U.S.C. § 402(a) ........................................................................ Stat. Add. 30

47 U.S.C. § 1302(d)(1)................................................................. Stat. Add. 31

47 U.S.C. § 1601 ........................................................................... Stat. Add. 32

47 U.S.C. § 1608(1) ...................................................................... Stat. Add. 34

47 U.S.C. § 1608(4) ...................................................................... Stat. Add. 35

47 U.S.C. § 1602 ........................................................................... Stat. Add. 36

47 U.S.C. § 1603 ........................................................................... Stat. Add. 37

50 U.S.C. § 4552 ........................................................................... Stat. Add. 48

Secure Equipment Act .................................................................. Stat. Add. 52

Secure Networks Act ..................................................................... Stat. Add. 54

2019 NDAA § 889 ........................................................................ Stat. Add. 71

2019 NDAA § 1703 ...................................................................... Stat. Add. 75

Communications Act of 1934, Pub. L. No. 90-379, 82 Stat. 290 (amended 1968)
.......................................................................................................... Stat. Add. 76

## 31 C.F.R. § 800

### §800. REGULATIONS PERTAINING TO CERTAIN INVESTMENTS IN THE UNITED STATES BY FOREIGN PERSONS.

### Appendix A. Covered Investment Critical Infrastructure and Functions Related to Covered Investment Critical Infrastructure.

Column 1.

(ii) Any internet exchange point that supports public peering.

(iii) Any submarine cable system requiring a license under section 1 of the Cable Landing License Act of 1921 (47 U.S.C. 34), which includes any associated submarine cable, submarine cable landing facilities, and any facility that performs network management, monitoring, maintenance, or other operational functions for such submarine cable system.

[. . .]

(xi) Any system, including facilities, for the generation, transmission, distribution, or storage of electric energy comprising the bulk-power system, as defined in section 215(a)(1) of the Federal Power Act, as amended (16 U.S.C. 824o(a)(1)).

## 47 C.F.R. § 2.901

### §2.901. Basis and purpose.

(a) In order to carry out its responsibilities under the Communications Act and the various treaties and international regulations, and in order to promote efficient use of the radio spectrum, the Commission has developed technical standards and other requirements for radio frequency equipment and parts or components thereof. The technical standards applicable to individual types of equipment are found in that part of the rules governing the service wherein the equipment is to be operated. In addition to the technical standards provided, the rules governing the service may require that such equipment be authorized under Supplier's Declaration of Conformity or receive a grant of certification from a Telecommunication Certification Body.

(b) Sections 2.906 through 2.1077 describe the procedure for a Supplier's Declaration of Conformity and the procedures to be followed in obtaining certification and the conditions attendant to such a grant.

# 5 U.S.C. § 706

## §706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

> (B) contrary to constitutional right, power, privilege, or immunity;

> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

> (D) without observance of procedure required by law;

> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**10 U.S.C. § 2224**

## §2224. Defense Information Assurance Program

(a) Defense Information Assurance Program.—

The Secretary of Defense shall carry out a program, to be known as the "Defense Information Assurance Program", to protect and defend Department of Defense information, information systems, and information networks that are critical to the Department and the armed forces during day-to-day operations and operations in times of crisis.

(b) Objectives of the Program.—

The objectives of the program shall be to provide continuously for the availability, integrity, authentication, confidentiality, nonrepudiation, and rapid restitution of information and information systems that are essential elements of the Defense Information Infrastructure.

(c) Program Strategy.—In carrying out the program, the Secretary shall develop a program strategy that encompasses those actions necessary to assure the readiness, reliability, continuity, and integrity of Defense information systems, networks, and infrastructure, including through compliance with subchapter II of chapter 35 of title 44, including through compliance with subchapter III of chapter 35 of title 44. The program strategy shall include the following:

(1) A vulnerability and threat assessment of elements of the defense and supporting nondefense information infrastructures that are essential to the operations of the Department and the armed forces.

(2) Development of essential information assurances technologies and programs.

(3) Organization of the Department, the armed forces, and supporting activities to defend against information warfare.

(4) Joint activities of the Department with other departments and agencies of the Government, State and local agencies, and elements of the national information infrastructure.

(5) The conduct of exercises, war games, simulations, experiments, and other activities designed to prepare the Department to respond to information warfare threats.

(6) Development of proposed legislation that the Secretary considers necessary for implementing the program or for otherwise responding to the information warfare threat.

(d) Coordination.—

In carrying out the program, the Secretary shall coordinate, as appropriate, with the head of any relevant Federal agency and with representatives of those national critical information infrastructure systems that are essential to the operations of the Department and the armed forces on information assurance measures necessary to the protection of these systems.

[(e) Repealed. Pub. L. 108–136, div. A, title X, § 1031(a)(12), Nov. 24, 2003, 117 Stat. 1597.]

(f) Information Assurance Test Bed.—The Secretary shall develop an information assurance test bed within the Department of Defense to provide—

(1) an integrated organization structure to plan and facilitate the conduct of simulations, war games, exercises, experiments, and other activities to prepare and inform the Department regarding information warfare threats; and

(2) organization and planning means for the conduct by the Department of the integrated or joint exercises and experiments with elements of the national information systems infrastructure and other non-Department of Defense organizations that are responsible for the oversight and management of critical information systems and infrastructures on which the Department, the armed forces, and supporting activities depend for the conduct of daily operations and operations during crisis.

. . .

Evaluation of Cyber Vulnerabilities of Department of Defense Critical Infrastructure

Pub.L. 114-328, Div. A, Title XVI, § 1650, Dec. 23, 2016, 130 Stat. 2607, as amended Pub.L. 115-92, Div. A, Title XVI, § 1643, Dec. 12, 2017, 131 Stat. 1748; Pub.L. 115-232, Div. A, Title XVI, § 1634, Aug. 13, 2018, 132 Stat. 2125, provided that:

"(a) Plan for evaluation.--

"(1) In general.— Not later than 180 days after the date of the enactment of this Act [Dec. 23, 2016], the Secretary shall submit to the congressional defense committees [Committees on Armed Services and Appropriations of the Senate and the House of Representatives] a plan for the evaluation of the cyber vulnerabilities of the critical infrastructure of the Department of Defense. . . ."

## 23 U.S.C. § 119

(a) Establishment.—

The Secretary shall establish and implement a national highway performance program under this section.

(b) Purposes.—The purposes of the national highway performance program shall be—

(1) to provide support for the condition and performance of the National Highway System;

(2) to provide support for the construction of new facilities on the National Highway System;

(3) to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in an asset management plan of a State for the National Highway System; and

(4) to provide support for activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters.

(c) Eligible Facilities.—

Except as provided in subsection (d), to be eligible for funding apportioned under section 104(b)(1) to carry out this section, a facility shall be located on the National Highway System, as defined in section 103.

(d) Eligible Projects.—Funds apportioned to a State to carry out the national highway performance program may be obligated only for a project on an eligible facility that is—

(1)

(A) a project or part of a program of projects supporting progress toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System; and

(B) consistent with sections 134 and 135; and

(2) for 1 or more of the following purposes:

(A) Construction, reconstruction, resurfacing, restoration, rehabilitation, preservation, or operational improvement of segments of the National Highway System.

(B) Construction, replacement (including replacement with fill material), rehabilitation, preservation, and protection (including scour countermeasures, seismic retrofits, impact protection measures, security countermeasures, and protection against extreme events) of bridges on the National Highway System.

(C) Construction, replacement (including replacement with fill material), rehabilitation, preservation, and protection (including impact protection measures, security countermeasures, and protection against extreme events) of tunnels on the National Highway System.

(D) Inspection and evaluation, as described in section 144, of bridges and tunnels on the National Highway System, and inspection and evaluation of other highway infrastructure assets on the National Highway System, including signs and sign structures, earth retaining walls, and drainage structures.

(E) Training of bridge and tunnel inspectors, as described in section 144.

(F) Construction, rehabilitation, or replacement of existing ferry boats and ferry boat facilities, including approaches, that connect road segments of the National Highway System.

(G) Construction, reconstruction, resurfacing, restoration, rehabilitation, and preservation of, and operational improvements for, a Federal-aid highway not on the National Highway System, and construction of a transit project eligible for assistance under chapter 53 of title 49, if—

(i) the highway project or transit project is in the same corridor as, and in proximity to, a fully access-controlled highway designated as a part of the National Highway System;

(ii) the construction or improvements will reduce delays or produce travel time savings on the fully access-controlled highway described in clause (i) and improve regional traffic flow; and

(iii) the construction or improvements are more cost-effective, as determined by benefit-cost analysis, than an improvement to the fully access-controlled highway described in clause (i).

(H) Bicycle transportation and pedestrian walkways in accordance with section 217.

(I) Highway safety improvements for segments of the National Highway System.

(J) Capital and operating costs for traffic and traveler information monitoring, management, and control facilities and programs.

(K) Development and implementation of a State asset management plan for the National Highway System in accordance with this section, including data collection, maintenance, and integration and the cost associated with obtaining, updating, and licensing software and equipment required for risk-based asset management and performance-based management.

(L) Infrastructure-based intelligent transportation systems capital improvements, including the installation of vehicle-to-infrastructure communication equipment.

(M) Environmental restoration and pollution abatement in accordance with section 328.

(N) Control of noxious weeds and aquatic noxious weeds and establishment of native species in accordance with section 329.

(O) Environmental mitigation efforts related to projects funded under this section, as described in subsection (g).

(P) Construction of publicly owned intracity or intercity bus terminals servicing the National Highway System.

(Q) Undergrounding public utility infrastructure carried out in conjunction with a project otherwise eligible under this section.

(R) Resiliency improvements on the National Highway System, including protective features described in subsection (k)(2).

(S) Implement activities to protect segments of the National Highway System from cybersecurity threats.

(e) State Performance Management.—

(1) In general.—

A State shall develop a risk-based asset management plan for the National Highway System to improve or preserve the condition of the assets and the performance of the system.

(2) Performance driven plan.—

A State asset management plan shall include strategies leading to a program of projects that would make progress toward achievement of the State targets for asset condition and performance of the National Highway System in accordance with section 150(d) and supporting the progress toward the achievement of the national goals identified in section 150(b).

(3) Scope.—

In developing a risk-based asset management plan, the Secretary shall encourage States to include all infrastructure assets within the right-of-way corridor in such plan.

(4) Plan contents.—A State asset management plan shall, at a minimum, be in a form that the Secretary determines to be appropriate and include—

(A) a summary listing of the pavement and bridge assets on the National Highway System in the State, including a description of the condition of those assets;

(B) asset management objectives and measures;

(C) performance gap identification;

(D) lifecycle cost and risk management analyses, both of which shall take into consideration extreme weather and resilience;

(E) a financial plan; and

(F) investment strategies.

(5) Requirement for plan.—

(A) In general.—

Notwithstanding section 120, each fiscal year, if the Secretary determines that a State has not developed and implemented a State asset management

plan consistent with this section, the Federal share payable on account of any project or activity for which funds are obligated by the State in that fiscal year under this section shall be 65 percent.

(B) Determination.—

The Secretary shall make the determination under subparagraph (A) for a fiscal year not later than the day before the beginning of such fiscal year.

(6) Certification of plan development process.—

(A) In general.—Not later than 90 days after the date on which a State submits a request for approval of the process used by the State to develop the State asset management plan for the National Highway System, the Secretary shall—

(i) review the process; and

(ii)

(I) certify that the process meets the requirements established by the Secretary; or

(II) deny certification and specify actions necessary for the State to take to correct deficiencies in the State process.

(B) Recertification.—

Not less frequently than once every 4 years, the Secretary shall review and recertify that the process used by a State to develop and maintain the State asset management plan for the National Highway System meets the requirements for the process, as established by the Secretary.

(C) Opportunity to cure.—If the Secretary denies certification under subparagraph (A), the Secretary shall provide the State with—

(i) not less than 90 days to cure the deficiencies of the plan, during which time period all penalties and other legal impacts of a denial of certification shall be stayed; and

(ii) a written statement of the specific actions the Secretary determines to be necessary for the State to cure the plan.

(7) Performance achievement.—

A State that does not achieve or make significant progress toward achieving the targets of the State for performance measures described in section 150(d) for the National Highway System shall include as part of the performance target report under section 150(e) a description of the actions the State will undertake to achieve the targets.

(8) Process.—

Not later than 18 months after the date of enactment of the MAP–21, the Secretary shall, by regulation and in consultation with State departments of transportation, establish the process to develop the State asset management plan described in paragraph (1).

(f) Interstate System and NHS Bridge Conditions.—

(1) Condition of interstate system.—

(A) Penalty.—If a State reports that the condition of the Interstate System, excluding bridges on the Interstate System, has fallen below the minimum condition level established by the Secretary under section 150(c)(3), the State shall be required, during the following fiscal year—

(i) to obligate, from the amounts apportioned to the State under section 104(b)(1), an amount that is not less than the amount of funds apportioned to the State for fiscal year 2009 under the Interstate maintenance program for the purposes described in this section (as in effect on the day before the date of enactment of the MAP–21), except that for each year after fiscal year 2013, the amount required to be obligated under this clause shall be increased by 2 percent over the amount required to be obligated in the previous fiscal year; and

(ii) to transfer, from the amounts apportioned to the State under section 104(b)(2) (other than amounts suballocated to metropolitan areas and other areas of the State under section 133(d)) to the apportionment of the State under section 104(b)(1), an amount equal to 10 percent of the amount of funds apportioned to the State for fiscal year 2009 under the Interstate maintenance program for the purposes described in this section (as in effect on the day before the date of enactment of the MAP–21).

(B) Restoration.—

The obligation requirement for the Interstate System in a State required by subparagraph (A) for a fiscal year shall remain in effect for each subsequent fiscal year until such time as the condition of the Interstate System in the State exceeds the minimum condition level established by the Secretary.

(2) Condition of nhs bridges.—

(A) Penalty.—

If the Secretary determines that, for the 3-year-period preceding the date of the determination, more than 10 percent of the total deck area of bridges in the State on the National Highway System is located on bridges that have been classified as in poor condition, an amount equal to 50 percent of funds apportioned to such State for fiscal year 2009 to carry out section 144 (as in effect the day before enactment of MAP–21) shall be set aside from amounts apportioned to a State for a fiscal year under section 104(b)(1) only for eligible projects on bridges on the National Highway System.

(B) Restoration.—

The set-aside requirement for bridges on the National Highway System in a State under subparagraph (A) for a fiscal year shall remain in effect for each subsequent fiscal year until such time as less than 10 percent of the total deck area of bridges in the State on the National Highway System is located on bridges that have been classified as in poor condition, as determined by the Secretary.

(g) Environmental Mitigation.—

(1) Eligible activities.—In accordance with all applicable Federal law (including regulations), environmental mitigation efforts referred to in subsection (d)(2)(O) include participation in natural habitat and wetlands mitigation efforts relating to projects funded under this title, which may include—

(A) participation in mitigation banking or other third-party mitigation arrangements, such as—

(i) the purchase of credits from commercial mitigation banks;

(ii) the establishment and management of agency-sponsored mitigation banks; and

(iii) the purchase of credits or establishment of in-lieu fee mitigation programs;

(B) contributions to statewide and regional efforts to conserve, restore, enhance, and create natural habitats and wetlands; and

(C) the development of statewide and regional environmental protection plans, including natural habitat and wetland conservation and restoration plans.

(2) Inclusion of other activities.—

The banks, efforts, and plans described in paragraph (1) include any such banks, efforts, and plans developed in accordance with applicable law (including regulations).

(3) Terms and conditions.—The following terms and conditions apply to natural habitat and wetlands mitigation efforts under this subsection:

(A) Contributions to the mitigation effort may—

(i) take place concurrent with, or in advance of, commitment of funding under this title to a project or projects; and

(ii) occur in advance of project construction only if the efforts are consistent with all applicable requirements of Federal law (including regulations) and State transportation planning processes.

(B) Credits from any agency-sponsored mitigation bank that are attributable to funding under this section may be used only for projects funded under this title, unless the agency pays to the Secretary an amount equal to the Federal funds attributable to the mitigation bank credits the agency uses for purposes other than mitigation of a project funded under this title.

(4) Preference.—

At the discretion of the project sponsor, preference shall be given, to the maximum extent practicable, to mitigating an environmental impact through the use of a mitigation bank, in-lieu fee, or other third-party mitigation arrangement, if the use of credits from the mitigation bank or in-lieu fee, or the other third-party mitigation arrangement for the project, is approved by the applicable Federal agency.

(h) TIFIA Program.—

Upon Secretarial approval of credit assistance under chapter 6, the Secretary, at the request of a State, may allow the State to use funds apportioned under section 104(b)(1) to pay subsidy and administrative costs necessary to provide an eligible entity Federal credit assistance under chapter 6 with respect to a project eligible for assistance under this section.

(i) Additional Funding Eligibility for Certain Bridges.—

(1) In general.—

Funds apportioned to a State to carry out the national highway performance program may be obligated for a project for the reconstruction, resurfacing, restoration, rehabilitation, or preservation of a bridge not on the National Highway System, if the bridge is on a Federal-aid highway.

(2) Limitation.—

A State required to make obligations under subsection (f) shall ensure such requirements are satisfied in order to use the flexibility under paragraph (1).

(j) Critical Infrastructure.—

(1) Critical infrastructure defined.—

In this subsection, the term "critical infrastructure" means those facilities the incapacity or failure of which would have a debilitating impact on national or regional economic security, national or regional energy security, national or regional public health or safety, or any combination of those matters.

(2) Consideration.—

The asset management plan of a State may include consideration of critical infrastructure from among those facilities in the State that are eligible under subsection (c).

(3) Risk reduction.—

A State may use funds apportioned under this section for projects intended to reduce the risk of failure of critical infrastructure in the State.

(k) Protective Features.—

(1) In general.—

A State may use not more than 15 percent of the funds apportioned to the State under section 104(b)(1) for each fiscal year for 1 or more protective features on a Federal-aid highway or bridge not on the National Highway System, if the protective feature is designed to mitigate the risk of recurring damage or the cost of future repairs from extreme weather events, flooding, or other natural disasters.

(2) Protective features described.—A protective feature referred to in paragraph (1) includes—

　　(A) raising roadway grades;

　　(B) relocating roadways in a base floodplain to higher ground above projected flood elevation levels or away from slide prone areas;

　　(C) stabilizing slide areas;

　　(D) stabilizing slopes;

　　(E) lengthening or raising bridges to increase waterway openings;

　　(F) increasing the size or number of drainage structures;

　　(G) replacing culverts with bridges or upsizing culverts;

　　(H) installing seismic retrofits on bridges;

　　(I) adding scour protection at bridges, installing riprap, or adding other scour, stream stability, coastal, or other hydraulic countermeasures, including spur dikes; and

　　(J) the use of natural infrastructure to mitigate the risk of recurring damage or the cost of future repair from extreme weather events, flooding, or other natural disasters.

(3) Savings provision.—

Nothing in this subsection limits the ability of a State to carry out a project otherwise eligible under subsection (d) using funds apportioned under section 104(b)(1).

## 28 U.S.C. § 2342(1)

**§2342. Jurisdiction of court of appeals**

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

(1) all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47;

## 42 U.S.C. § 5195(c)

### §5195. Declaration of policy

The purpose of this subchapter is to provide a system of emergency preparedness for the protection of life and property in the United States from hazards and to vest responsibility for emergency preparedness jointly in the Federal Government and the States and their political subdivisions. The Congress recognizes that the organizational structure established jointly by the Federal Government and the States and their political subdivisions for emergency preparedness purposes can be effectively utilized to provide relief and assistance to people in areas of the United States struck by a hazard. The Federal Government shall provide necessary direction, coordination, and guidance, and shall provide necessary assistance, as authorized in this subchapter so that a comprehensive emergency preparedness system exists for all hazards.

# 47 U.S.C. § 151

## §151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

## 47 U.S.C. § 302a

### §302. Devices which interfere with radio reception

(a) Regulations

The Commission may, consistent with the public interest, convenience, and necessity, make reasonable regulations (1) governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications; and (2) establishing minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy. Such regulations shall be applicable to the manufacture, import, sale, offer for sale, or shipment of such devices and home electronic equipment and systems, and to the use of such devices.

47 U.S.C. § 303

## §303. Powers and duties of Commission

Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

(a) Classify radio stations;

(b) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

(c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

(d) Determine the location of classes of stations or individual stations;

(e) Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein;

(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: Provided, however, That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with;

(g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

(h) Have authority to establish areas or zones to be served by any station;

(i) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

(j) Have authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable;

Stat. Add. 22

(k) Have authority to exclude from the requirements of any regulations in whole or in part any radio station upon railroad rolling stock, or to modify such regulations in its discretion;

(l)

(1) Have authority to prescribe the qualifications of station operators, to classify them according to the duties to be performed, to fix the forms of such licenses, and to issue them to persons who are found to be qualified by the Commission and who otherwise are legally eligible for employment in the United States, except that such requirement relating to eligibility for employment in the United States shall not apply in the case of licenses issued by the Commission to (A) persons holding United States pilot certificates; or (B) persons holding foreign aircraft pilot certificates which are valid in the United States, if the foreign government involved has entered into a reciprocal agreement under which such foreign government does not impose any similar requirement relating to eligibility for employment upon citizens of the United States;

(2) Notwithstanding paragraph (1) of this subsection, an individual to whom a radio station is licensed under the provisions of this chapter may be issued an operator's license to operate that station.

(3) In addition to amateur operator licenses which the Commission may issue to aliens pursuant to paragraph (2) of this subsection, and notwithstanding section 301 of this title and paragraph (1) of this subsection, the Commission may issue authorizations, under such conditions and terms as it may prescribe, to permit an alien licensed by his government as an amateur radio operator to operate his amateur radio station licensed by his government in the United States, its possessions, and the Commonwealth of Puerto Rico provided there is in effect a multilateral or bilateral agreement, to which the United States and the alien's government are parties, for such operation on a reciprocal basis by United States amateur radio operators. Other provisions of this chapter and of subchapter II of chapter 5, and chapter 7, of title 5 shall not be applicable to any request or application for or modification, suspension, or cancellation of any such authorization.

(m)

(1) Have authority to suspend the license of any operator upon proof sufficient to satisfy the Commission that the licensee—

(A) has violated, or caused, aided, or abetted the violation of, any provision of any Act, treaty, or convention binding on the United States, which the Commission is authorized to administer, or any regulation made by the Commission under any such Act, treaty, or convention; or

(B) has failed to carry out a lawful order of the master or person lawfully in charge of the ship or aircraft on which he is employed; or

(C) has willfully damaged or permitted radio apparatus or installations to be damaged; or

(D) has transmitted superfluous radio communications or signals or communications containing profane or obscene words, language, or meaning, or has knowingly transmitted—

(1) false or deceptive signals or communications, or

(2) a call signal or letter which has not been assigned by proper authority to the station he is operating; or

(E) has willfully or maliciously interfered with any other radio communications or signals; or

(F) has obtained or attempted to obtain, or has assisted another to obtain or attempt to obtain, an operator's license by fraudulent means.

(2) No order of suspension of any operator's license shall take effect until fifteen days' notice in writing thereof, stating the cause for the proposed suspension, has been given to the operator licensee who may make written application to the Commission at any time within said fifteen days for a hearing upon such order. The notice to the operator licensee shall not be effective until actually received by him, and from that time he shall have fifteen days in which to mail the said application. In the event that physical conditions prevent mailing of the application at the expiration of the fifteen-day period, the application shall then be mailed as soon as possible thereafter, accompanied by a satisfactory explanation of the delay. Upon receipt by the Commission of such application for hearing, said order of suspension shall be held in abeyance until the conclusion of the hearing which shall be conducted under such rules as the Commission may prescribe. Upon the conclusion of said hearing the Commission may affirm, modify, or revoke said order of suspension.

(n) Have authority to inspect all radio installations associated with stations required to be licensed by any Act, or which the Commission by rule has authorized to operate without a license under section 307(e)(1) of this title, or which are subject to the provisions of any Act, treaty, or convention binding on the United States, to ascertain whether in construction, installation, and operation they conform to the requirements of the rules and regulations of the Commission, the provisions of any Act, the terms of any treaty or convention binding on the United States, and the conditions of the license or other instrument of authorization under which they are constructed, installed, or operated.

(o) Have authority to designate call letters of all stations;

(p) Have authority to cause to be published such call letters and such other announcements and data as in the judgment of the Commission may be required for the efficient operation of radio stations subject to the jurisdiction of the United States and for the proper enforcement of this chapter;

(q) Have authority to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation. The permittee or licensee, and the tower owner in any case in which the owner is not the permittee or licensee, shall maintain the painting and/or illumination of the tower as prescribed by the Commission pursuant to this section. In the event that the tower ceases to be licensed by the Commission for the transmission of radio energy, the owner of the tower shall maintain the prescribed painting and/or illumination of such tower until it is dismantled, and the Commission may require the owner to dismantle and remove the tower when the Administrator of the Federal Aviation Agency determines that there is a reasonable possibility that it may constitute a menace to air navigation.

(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.

(s) Have authority to require that apparatus designed to receive television pictures broadcast simultaneously with sound be capable of adequately receiving all frequencies allocated by the Commission to television broadcasting when such

apparatus is shipped in interstate commerce, or is imported from any foreign country into the United States, for sale or resale to the public.

(t) Notwithstanding the provisions of section 301(e) of this title, have authority, in any case in which an aircraft registered in the United States is operated (pursuant to a lease, charter, or similar arrangement) by an aircraft operator who is subject to regulation by the government of a foreign nation, to enter into an agreement with such government under which the Commission shall recognize and accept any radio station licenses and radio operator licenses issued by such government with respect to such aircraft.

(u) Require that, if technically feasible—

(1) apparatus designed to receive or play back video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States and uses a picture screen of any size—

(A) be equipped with built-in closed caption decoder circuitry or capability designed to display closed-captioned video programming;

(B) have the capability to decode and make available the transmission and delivery of video description services as required by regulations reinstated and modified pursuant to section 613(f) of this title; and

(C) have the capability to decode and make available emergency information (as that term is defined in section 79.2 of the Commission's regulations (47 CFR 79.2)) in a manner that is accessible to individuals who are blind or visually impaired; and

(2) notwithstanding paragraph (1) of this subsection—

(A) apparatus described in such paragraph that use a picture screen that is less than 13 inches in size meet the requirements of subparagraph (A), (B), or (C) of such paragraph only if the requirements of such subparagraphs are achievable (as defined in section 617 of this title);

(B) any apparatus or class of apparatus that are display-only video monitors with no playback capability are exempt from the requirements of such paragraph; and

(C) the Commission shall have the authority, on its own motion or in response to a petition by a manufacturer, to waive the requirements of this subsection for any apparatus or class of apparatus—

(i) primarily designed for activities other than receiving or playing back video programming transmitted simultaneously with sound; or

(ii) for equipment designed for multiple purposes, capable of receiving or playing video programming transmitted simultaneously with sound but whose essential utility is derived from other purposes.

(v) Have exclusive jurisdiction to regulate the provision of direct-to-home satellite services. As used in this subsection, the term "direct-to-home satellite services" means the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite.

(w) Omitted.

(x) Require, in the case of an apparatus designed to receive television signals that are shipped in interstate commerce or manufactured in the United States and that have a picture screen 13 inches or greater in size (measured diagonally), that such apparatus be equipped with a feature designed to enable viewers to block display of all programs with a common rating, except as otherwise permitted by regulations pursuant to section 330(c)(4) of this title.

(y) Have authority to allocate electromagnetic spectrum so as to provide flexibility of use, if—

(1) such use is consistent with international agreements to which the United States is a party; and

(2) the Commission finds, after notice and an opportunity for public comment, that—

(A) such an allocation would be in the public interest;

(B) such use would not deter investment in communications services and systems, or technology development; and

(C) such use would not result in harmful interference among users.

(z) Require that—

(1) if achievable (as defined in section 617 of this title), apparatus designed to record video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States, enable the rendering or the pass through of closed captions, video description signals, and emergency information (as that term is defined in section 79.2 of title 47, Code of Federal Regulations) such that viewers are able to activate and de-activate the closed captions and video description as the video programming is played back on a picture screen of any size; and

(2) interconnection mechanisms and standards for digital video source devices are available to carry from the source device to the consumer equipment the information necessary to permit or render the display of closed captions and to make encoded video description and emergency information audible.

(aa) Require—

(1) if achievable (as defined in section 617 of this title) that digital apparatus designed to receive or play back video programming transmitted in digital format simultaneously with sound, including apparatus designed to receive or display video programming transmitted in digital format using Internet protocol, be designed, developed, and fabricated so that control of appropriate built-in apparatus functions are accessible to and usable by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

(2) that if on-screen text menus or other visual indicators built in to the digital apparatus are used to access the functions of the apparatus described in paragraph (1), such functions shall be accompanied by audio output that is either integrated or peripheral to the apparatus, so that such menus or indicators are accessible to and usable by individuals who are blind or visually impaired in real-time;

(3) that for such apparatus equipped with the functions described in paragraphs (1) and (2) built in access to those closed captioning and video description features through a mechanism that is reasonably comparable to a button, key, or icon designated for activating the closed captioning or accessibility features; and

(4) that in applying this subsection the term "apparatus" does not include a navigation device, as such term is defined in section 76.1200 of the Commission's rules (47 CFR 76.1200).

(bb) Require—

(1) if achievable (as defined in section 617 of this title), that the on-screen text menus and guides provided by navigation devices (as such term is defined in section 76.1200 of title 47, Code of Federal Regulations) for the display or selection of multichannel video programming are audibly accessible in real-time upon request by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

(2) for navigation devices with built-in closed captioning capability, that access to that capability through a mechanism is reasonably comparable to a button, key, or icon designated for activating the closed captioning, or accessibility features; and

(3) that, with respect to navigation device features and functions—

(A) delivered in software, the requirements set forth in this subsection shall apply to the manufacturer of such software; and

(B) delivered in hardware, the requirements set forth in this subsection shall apply to the manufacturer of such hardware.

**47 U.S.C. § 402(a)**

**§402. Judicial review of Commission's orders and decisions**

(a) Procedure

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28.

## 47 U.S.C. § 1302(d)(1)

**§1302. Advanced telecommunications incentives**

(d) Definitions

For purposes of this subsection:

(1) Advanced telecommunications capability

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

## 47 U.S.C. § 1601

**§1601. Determination of communications equipment or services posing national security risks**

**(a) Publication of covered communications equipment or services list**

Not later than 1 year after March 12, 2020, the Commission shall publish on its website a list of covered communications equipment or services.

**(b) Publication by Commission**

The Commission shall place on the list published under subsection (a) any communications equipment or service, if and only if such equipment or service—

(1) is produced or provided by any entity, if, based exclusively on the determinations described in paragraphs (1) through (4) of subsection (c), such equipment or service produced or provided by such entity poses an unacceptable risk to the national security of the United States or the security and safety of United States persons; and

(2) is capable of—

(A) routing or redirecting user data traffic or permitting visibility into any user data or packets that such equipment or service transmits or otherwise handles;

(B) causing the network of a provider of advanced communications service to be disrupted remotely; or

(C) otherwise posing an unacceptable risk to the national security of the United States or the security and safety of United States persons.

**(c) Reliance on certain determinations**

In taking action under subsection (b)(1), the Commission shall place on the list any communications equipment or service that poses an unacceptable risk to the national security of the United States or the security and safety of United States persons based solely on one or more of the following determinations:

(1) A specific determination made by any executive branch interagency body with appropriate national security expertise, including the Federal Acquisition Security Council established under section 1322(a) of title 41.

(2) A specific determination made by the Department of Commerce pursuant to Executive Order No. 13873 (84 Fed. Reg. 22689; relating to securing the information and communications technology and services supply chain).

(3) The communications equipment or service being covered telecommunications equipment or services, as defined in section 889(f)(3) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1918).

(4) A specific determination made by an appropriate national security agency.

## (d) Updating of list

(1) In general

The Commission shall periodically update the list published under subsection (a) to address changes in the determinations described in paragraphs (1) through (4) of subsection (c).

(2) Monitoring of determinations

The Commission shall monitor the making or reversing of the determinations described in paragraphs (1) through (4) of subsection (c) in order to place additional communications equipment or services on the list published under subsection (a) or to remove communications equipment or services from such list. If a determination described in any such paragraph that provided the basis for a determination by the Commission under subsection (b)(1) with respect to any communications equipment or service is reversed, the Commission shall remove such equipment or service from such list, except that the Commission may not remove such equipment or service from such list if any other determination described in any such paragraph provides a basis for inclusion on such list by the Commission under subsection (b)(1) with respect to such equipment or service.

(3) Public notification

For each 12-month period during which the list published under subsection (a) is not updated, the Commission shall notify the public that no updates were necessary during such period to protect national security or to address changes in the determinations described in paragraphs (1) through (4) of subsection (c).

## 47 U.S.C. § 1608(1)

### §1608. Definitions

In this chapter:

(1) Advanced communications service

The term "advanced communications service" has the meaning given the term "advanced telecommunications capability" in section 1302 of this title.

## 47 U.S.C. § 1608(4)

### §1608. Definitions

In this chapter:

(4) Communications equipment or service

The term "communications equipment or service" means any equipment or service that is essential to the provision of advanced communications service.

# 47 U.S.C. § 1602

## §1602. Prohibition on use of certain Federal subsidies

(a) In general

(1) Prohibition

A Federal subsidy that is made available through a program administered by the Commission and that provides funds to be used for the capital expenditures necessary for the provision of advanced communications service may not be used to—

(A) purchase, rent, lease, or otherwise obtain any covered communications equipment or service; or

(B) maintain any covered communications equipment or service previously purchased, rented, leased, or otherwise obtained.

(2) Timing

Paragraph (1) shall apply with respect to any covered communications equipment or service beginning on the date that is 60 days after the date on which the Commission places such equipment or service on the list required by section 1601(a) of this title. In the case of any covered communications equipment or service that is on the initial list published under such section, such equipment or service shall be treated as being placed on the list on the date on which such list is published.

(b) Completion of proceeding

Not later than 180 days after March 12, 2020, the Commission shall adopt a Report and Order to implement subsection (a). If the Commission has, before March 12, 2020, taken action that in whole or in part implements subsection (a), the Commission is not required to revisit such action, but only to the extent such action is consistent with this section.

## 47 U.S.C. § 1603

### §1603. Secure and Trusted Communications Networks Reimbursement Program

(a) In general

The Commission shall establish a reimbursement program, to be known as the "Secure and Trusted Communications Networks Reimbursement Program", to make reimbursements to providers of advanced communications service to replace covered communications equipment or services.

(b) Eligibility

The Commission may not make a reimbursement under the Program to a provider of advanced communications service unless the provider--

(1) has 10,000,000 or fewer customers; and

(2) makes all of the certifications required by subsection (d)(4).

(c) Use of funds

(1) In general

A recipient of a reimbursement under the Program shall use reimbursement funds solely for the purposes of—

(A) permanently removing covered communications equipment or services purchased, rented, leased, or otherwise obtained—

(i) as defined in the Report and Order of the Commission in the matter of Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs (FCC 19–121; WC Docket No. 18–89; adopted November 22, 2019) (in this section referred to as the "Report and Order"); or

(ii) as determined to be covered by both the process of the Report and Order and the Designation Orders of the Commission on June 30, 2020 (DA 20–690; PS Docket No. 19–351; adopted June 30, 2020) (DA 20–691; PS Docket No. 19–352; adopted June 30, 2020) (in this section collectively referred to as the "Designation Orders");

(B) replacing the covered communications equipment or services removed as described in subparagraph (A) with communications equipment or services that are not covered communications equipment or services; and

(C) disposing of the covered communications equipment or services removed as described in subparagraph (A) in accordance with the requirements under subsection (d)(7).

(2) Limitations

A recipient of a reimbursement under the Program may not--

(A) use reimbursement funds to remove, replace, or dispose of any covered communications equipment or service purchased, rented, leased, or otherwise obtained on or after--

(i) publication of the Report and Order; or

(ii) in the case of covered communications equipment that only became covered pursuant to the Designation Orders, June 30, 2020; or

(B) purchase, rent, lease, or otherwise obtain any covered communications equipment or service, using reimbursement funds or any other funds (including funds derived from private sources).

(d) Implementation

(1) Suggested replacements

(A) Development of list

The Commission shall develop a list of suggested replacements of both physical and virtual communications equipment, application and management software, and services or categories of replacements of both physical and virtual communications equipment, application and management software and services.

(B) Neutrality

The list developed under subparagraph (A) shall be technology neutral and may not advantage the use of reimbursement funds for capital expenditures over operational expenditures, to the extent that the Commission determines that communications services can serve as an adequate substitute for the installation of communications equipment.

(2) Application process

(A) In general

The Commission shall develop an application process and related forms and materials for the Program.

(B) Cost estimate

(i) Initial estimate

The Commission shall require an applicant to provide an initial reimbursement cost estimate at the time of application, with supporting materials substantiating the costs.

(ii) Updates

During and after the application review process, the Commission may require an applicant to--

(I) update the initial reimbursement cost estimate submitted under clause (i); and

(II) submit additional supporting materials substantiating an updated cost estimate submitted under subclause (I).

(C) Mitigation of burden

In developing the application process under this paragraph, the Commission shall take reasonable steps to mitigate the administrative burdens and costs associated with the application process, while taking into account the need to avoid waste, fraud, and abuse in the Program.

(3) Application review process

(A) Deadline

(i) In general

Except as provided in clause (ii) and subparagraph (B), the Commission shall approve or deny an application for a reimbursement under the Program not later than 90 days after the date of the submission of the application.

(ii) Additional time needed by Commission

If the Commission determines that, because an excessive number of applications have been filed at one time, the Commission needs additional time for employees of the Commission to process the applications, the Commission may extend the deadline described in clause (i) for not more than 45 days.

(B) Opportunity for applicant to cure deficiency

If the Commission determines that an application is materially deficient (including by lacking an adequate cost estimate or adequate supporting materials), the Commission shall provide the applicant a 15-day period to cure the defect before denying the application. If such period would extend beyond the deadline under subparagraph (A) for approving or denying the application, such deadline shall be extended through the end of such period.

(C) Effect of denial

Denial of an application for a reimbursement under the Program shall not preclude the applicant from resubmitting the application or submitting a new application for a reimbursement under the Program at a later date.

(4) Certifications

An applicant for a reimbursement under the Program shall, in the application of the applicant, certify to the Commission that--

(A) as of the date of the submission of the application, the applicant--

(i) has developed a plan for--

(I) the permanent removal and replacement of any covered communications equipment or services that are in the communications network of the applicant as of such date; and

(II) the disposal of the equipment or services removed as described in subclause (I) in accordance with the requirements under paragraph (7); and

(ii) has developed a specific timeline (subject to paragraph (6)) for the permanent removal, replacement, and disposal of the covered communications equipment or services identified under clause (i), which timeline shall be submitted to the Commission as part of the application; and

(B) beginning on the date of the approval of the application, the applicant--

(i) will not purchase, rent, lease, or otherwise obtain covered communications equipment or services, using reimbursement funds or any other funds (including funds derived from private sources); and

(ii) in developing and tailoring the risk management practices of the applicant, will consult and consider the standards, guidelines, and best practices set forth in the cybersecurity framework developed by the National Institute of Standards and Technology.

(5) Distribution of reimbursement funds

(A) In general

Subject to subparagraph (C), the Commission shall make reasonable efforts to ensure that reimbursement funds are distributed equitably among all applicants for reimbursements under the Program according to the needs of the applicants, as identified by the applications of the applicants.

(B) Notification

If, at any time during the implementation of the Program, the Commission determines that $1,000,000,000 will not be sufficient to fully fund all approved applications for reimbursements under the Program, the Commission shall immediately notify--

(i) the Committee on Energy and Commerce and the Committee on Appropriations of the House of Representatives; and

(ii) the Committee on Commerce, Science, and Transportation and the Committee on Appropriations of the Senate.

(C) Priority for allocation

On and after December 27, 2020, the Commission shall allocate sufficient reimbursement funds--

(i) first, to approved applicants that have 2,000,000 or fewer customers, for removal and replacement of covered communications equipment, as defined in section 1608 of this title or as designated by the process set forth in the Report and Order;

(ii) after funds have been allocated to all applicants described in clause (i), to approved applicants that are accredited public or private non-commercial educational institutions providing their own facilities-based educational broadband service, as defined in section 27.4 of title 47, Code of Federal Regulations, or any successor regulation, for removal and replacement of covered communications equipment, as defined in section 1608 of this title or as designated by the process set forth in the Report and Order; and

(iii) after funds have been allocated to all applicants described in clause (ii), to any remaining approved applicants determined to be eligible for reimbursement under the Program.

(6) Removal, replacement, and disposal term

(A) Deadline

Except as provided in subparagraphs (B) and (C), the permanent removal, replacement, and disposal of any covered communications equipment or services identified under paragraph (4)(A)(i) shall be completed not later than 1 year after the date on which the Commission distributes reimbursement funds to the recipient.

(B) General extension

The Commission may grant an extension of the deadline described in subparagraph (A) for 6 months to all recipients of reimbursements under the Program if the Commission--

(i) finds that the supply of replacement communications equipment or services needed by the recipients to achieve the purposes of the Program is inadequate to meet the needs of the recipients; and

(ii) provides notice and a detailed justification for granting the extension to--

(I) the Committee on Energy and Commerce of the House of Representatives; and

(II) the Committee on Commerce, Science, and Transportation of the Senate.

(C) Individual extension

(i) Petition

A recipient of a reimbursement under the Program may petition the Commission for an extension for such recipient of the deadline described in subparagraph (A) or, if the Commission has granted an extension of such deadline under subparagraph (B), such deadline as so extended.

(ii) Grant

The Commission may grant a petition filed under clause (i) by extending, for the recipient that filed the petition, the deadline described in subparagraph (A) or, if the Commission has granted an extension of such deadline under subparagraph (B), such deadline as so extended, for a period of not more than 6 months if the Commission finds that, due to no fault of such recipient, such recipient is unable to complete the permanent removal, replacement, and disposal described in subparagraph (A).

(7) Disposal of covered communications equipment or services

The Commission shall include in the regulations promulgated under subsection (g) requirements for the disposal by a recipient of a reimbursement under the Program of covered communications equipment or services identified under paragraph (4)(A)(i) and removed from the network of the recipient in order to prevent such equipment or services from being used in the networks of providers of advanced communications service.

(8) Status updates

(A) In general

Not less frequently than once every 90 days beginning on the date on which the Commission approves an application for a reimbursement under the Program, the recipient of the reimbursement shall submit to the Commission a status update on the work of the recipient to permanently remove, replace, and dispose of the covered communications equipment or services identified under paragraph (4)(A)(i).

(B) Public posting

Not earlier than 30 days after the date on which the Commission receives a status update under subparagraph (A), the Commission shall make such status update public on the website of the Commission.

(C) Reports to Congress

Not less frequently than once every 180 days beginning on the date on which the Commission first makes funds available to a recipient of a reimbursement under the Program, the Commission shall prepare and submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a report on--

(i) the implementation of the Program by the Commission; and

(ii) the work by recipients of reimbursements under the Program to permanently remove, replace, and dispose of covered communications equipment or services identified under paragraph (4)(A)(i).

(e) Measures to avoid waste, fraud, and abuse

(1) In general

The Commission shall take all necessary steps to avoid waste, fraud, and abuse with respect to the Program.

(2) Spending reports

The Commission shall require recipients of reimbursements under the Program to submit to the Commission on a regular basis reports regarding how reimbursement funds have been spent, including detailed accounting of the covered communications equipment or services permanently removed and disposed of, and the replacement equipment or services purchased, rented, leased, or otherwise obtained, using reimbursement funds.

(3) Audits, reviews, and field investigations

The Commission shall conduct--

(A) regular audits and reviews of reimbursements under the Program to confirm that recipients of such reimbursements are complying with this chapter; and

(B) random field investigations to ensure that recipients of reimbursements under the Program are performing the work such recipients are required to perform under the commitments made in the applications of such recipients for reimbursements under the Program, including the permanent removal,

Stat. Add. 44

replacement, and disposal of the covered communications equipment or services identified under subsection (d)(4)(A)(i).

(4) Final certification

(A) In general

The Commission shall require a recipient of a reimbursement under the Program to submit to the Commission, in a form and at an appropriate time to be determined by the Commission, a certification stating that the recipient--

(i) has fully complied with (or is in the process of complying with) all terms and conditions of the Program;

(ii) has fully complied with (or is in the process of complying with) the commitments made in the application of the recipient for the reimbursement;

(iii) has permanently removed from the communications network of the recipient, replaced, and disposed of (or is in the process of permanently removing, replacing, and disposing of) all covered communications equipment or services that were in the network of the recipient as of the date of the submission of the application of the recipient for the reimbursement; and

(iv) has fully complied with (or is in the process of complying with) the timeline submitted by the recipient under subparagraph (A)(ii) of paragraph (4) of subsection (d) and the other requirements of such paragraph.

(B) Updated certification

If, at the time when a recipient of a reimbursement under the Program submits a certification under subparagraph (A), the recipient has not fully complied as described in clause (i), (ii), or (iv) of such subparagraph or has not completed the permanent removal, replacement, and disposal described in clause (iii) of such subparagraph, the Commission shall require the recipient to file an updated certification when the recipient has fully complied as described in such clause (i), (ii), or (iv) or completed such permanent removal, replacement, and disposal.

(f) Effect of removal of equipment or service from list

(1) In general

If, after the date on which a recipient of a reimbursement under the Program submits the application for the reimbursement, any covered communications equipment or service that is in the network of the recipient as of such date is removed from the list published under section 1601(a) of this title, the recipient may--

(A) return to the Commission any reimbursement funds received for the removal, replacement, and disposal of such equipment or service and be released from any requirement under this section to remove, replace, or dispose of such equipment or service; or

(B) retain any reimbursement funds received for the removal, replacement, and disposal of such equipment or service and remain subject to the requirements of this section to remove, replace, and dispose of such equipment or service as if such equipment or service continued to be on the list published under section 1601(a) of this title.

(2) Assurances

In the case of an assurance relating to the removal, replacement, or disposal of any equipment or service with respect to which the recipient returns to the Commission reimbursement funds under paragraph (1)(A), such assurance may be satisfied by making an assurance that such funds have been returned.

(g) Rulemaking

(1) Commencement

Not later than 90 days after March 12, 2020, the Commission shall commence a rulemaking to implement this section.

(2) Completion

The Commission shall complete the rulemaking under paragraph (1) not later than 1 year after March 12, 2020.

(h) Rule of construction regarding timing of reimbursement

Nothing in this section shall be construed to prohibit the Commission from making a reimbursement under the Program to a provider of advanced communications

service before the provider incurs the cost of the permanent removal, replacement, and disposal of the covered communications equipment or service for which the application of the provider has been approved under this section.

(i) Education efforts

The Commission shall engage in education efforts with providers of advanced communications service to--

(1) encourage such providers to participate in the Program; and

(2) assist such providers in submitting applications for the Program.

(j) Separate from Federal universal service programs

The Program shall be separate from any Federal universal service program established under section 254 of this title.

(k) Limitation

In carrying out this section, the Commission may not expend more than $1,900,000,000.

## 50 U.S.C. § 4552

§4552. Definitions

For purposes of this chapter, the following definitions shall apply:

(1) Critical component

The term "critical component" includes such components, subsystems, systems, and related special tooling and test equipment essential to the production, repair, maintenance, or operation of weapon systems or other items of equipment identified by the President as being essential to the execution of the national security strategy of the United States. Components identified as critical by a National Security Assessment conducted pursuant to section 113(i) of title 10 or by a Presidential determination as a result of a petition filed under section 1862 of title 19 shall be designated as critical components for purposes of this chapter, unless the President determines that the designation is unwarranted.

(2) Critical infrastructure

The term "critical infrastructure" means any systems and assets, whether physical or cyber-based, so vital to the United States that the degradation or destruction of such systems and assets would have a debilitating impact on national security, including, but not limited to, national economic security and national public health or safety.

(3) Critical technology

The term "critical technology" includes any technology designated by the President to be essential to the national defense.

(4) Critical technology item

The term "critical technology item" means materials directly employing, derived from, or utilizing a critical technology.

(5) Defense contractor

The term "defense contractor" means any person who enters into a contract with the United States-

    (A) to furnish materials, industrial resources, or a critical technology for the national defense; or

(B) to perform services for the national defense.

(6) Domestic industrial base

The term "domestic industrial base" means domestic sources which are providing, or which would be reasonably expected to provide, materials or services to meet national defense requirements during peacetime, national emergency, or war.

(7) Domestic source

The term "domestic source" means a business concern-

  (A) that performs in the United States or Canada substantially all of the research and development, engineering, manufacturing, and production activities required of such business concern under a contract with the United States relating to a critical component or a critical technology item; and

  (B) that procures from business concerns described in subparagraph (A) substantially all of any components and assemblies required under a contract with the United States relating to a critical component or critical technology item.

(8) Facilities

The term "facilities" includes all types of buildings, structures, or other improvements to real property (but excluding farms, churches or other places of worship, and private dwelling houses), and services relating to the use of any such building, structure, or other improvement.

(9) Foreign source

The term "foreign source" means a business entity other than a "domestic source".

(10) Guaranteeing agency

The term "guaranteeing agency" means a department or agency of the United States engaged in procurement for the national defense.

(11) Homeland security

The term "homeland security" includes efforts-

  (A) to prevent terrorist attacks within the United States;

(B) to reduce the vulnerability of the United States to terrorism;

(C) to minimize damage from a terrorist attack in the United States; and

(D) to recover from a terrorist attack in the United States.

(12) Industrial resources

The term "industrial resources" means materials, services, processes, or manufacturing equipment (including the processes, technologies, and ancillary services for the use of such equipment) needed to establish or maintain an efficient and modern national defense industrial base.

(13) Materials

The term "materials" includes-

(A) any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply; and

(B) any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items.

(14) National defense

The term "national defense" means programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity. Such term includes emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act [42 U.S.C. 5195 et seq.] and critical infrastructure protection and restoration.

(15) Person

The term "person" includes an individual, corporation, partnership, association, or any other organized group of persons, or legal successor or representative thereof, or any State or local government or agency thereof.

(16) Services

The term "services" includes any effort that is needed for or incidental to-

(A) the development, production, processing, distribution, delivery, or use of an industrial resource or a critical technology item;

(B) the construction of facilities;

(C) the movement of individuals and property by all modes of civil transportation; or

(D) other national defense programs and activities.

(17) Small business concern

The term "small business concern" means a business concern that meets the requirements of section 632(a) of title 15 and the regulations promulgated pursuant to that section, and includes such business concerns owned and controlled by socially and economically disadvantaged individuals or by women.

**Secure Equipment Act**

**SECURE EQUIPMENT ACT OF 2021**

An Act To ensure that the Federal Communications Commission prohibits authorization of radio frequency devices that pose a national security risk.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

## SECTION 1. SHORT TITLE.

This Act may be cited as the "Secure Equipment Act of 2021".

## SEC. 2. UPDATES TO EQUIPMENT AUTHORIZATION PROCESS OF FEDERAL COMMUNICATIONS COMMISSION.

(a) RULEMAKING.—

(1) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Commission shall adopt rules in the proceeding initiated in the Notice of Proposed Rulemaking in the matter of Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program (ET Docket No. 21–232; FCC 21–73; adopted June 17, 2021), in accordance with paragraph (2), to update the equipment authorization procedures of the Commission.

(2) UPDATES REQUIRED.—In the rules adopted under paragraph (1), the Commission shall clarify that the Commission will no longer review or approve any application for equipment authorization for equipment that is on the list of covered communications equipment or services published by the Commission under section 2(a) of the Secure and Trusted Communications Networks Act of 2019 (47 U.S.C. 1601(a)).

(3) APPLICABILITY.—

(A) IN GENERAL.—In the rules adopted under paragraph (1), the Commission may not provide for review or revocation of any equipment authorization granted before the date on which such rules are adopted on the basis of the equipment being on the list described in paragraph (2).

(B) RULE OF CONSTRUCTION.—Nothing in this section may be construed to prohibit the Commission, other than in the rules adopted under paragraph (1), from—

(i) examining the necessity of review or revocation of any equipment authorization on the basis of the equipment being on the list described in paragraph (2); or

(ii) adopting rules providing for any such review or revocation.

(b) DEFINITION.—In this section, the term "Commission" means the Federal Communications Commission.

**Secure Networks Act**

## SECURE AND TRUSTED COMMUNICATIONS NETWORKS ACT OF 2019

An Act To prohibit certain Federal subsidies from being used to purchase communications equipment or services posing national security risks, to provide for the establishment of a reimbursement program for the replacement of communications equipment or services posing such risks, and for other purposes. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the "Secure and Trusted Communications Networks Act of 2019".

## SEC. 2. DETERMINATION OF COMMUNICATIONS EQUIPMENT OR SERVICES POSING NATIONAL SECURITY RISKS.

(a) PUBLICATION OF COVERED COMMUNICATIONS EQUIPMENT OR SERVICES LIST.—Not later than 1 year after the date of the enactment of this Act, the Commission shall publish on its website a list of covered communications equipment or services.

(b) PUBLICATION BY COMMISSION.—The Commission shall place on the list published under subsection (a) any communications equipment or service, if and only if such equipment or service—

(1) is produced or provided by any entity, if, based exclusively on the determinations described in paragraphs (1) through (4) of subsection (c), such equipment or service produced or provided by such entity poses an unacceptable risk to the national security of the United States or the security and safety of United States persons; and

(2) is capable of—

(A) routing or redirecting user data traffic or permitting visibility into any user data or packets that such equipment or service transmits or otherwise handles;

(B) causing the network of a provider of advanced communications service to be disrupted remotely; or

Stat. Add. 54

(C) otherwise posing an unacceptable risk to the national security of the United States or the security and safety of United States persons.

(c) RELIANCE ON CERTAIN DETERMINATIONS.—In taking action under subsection (b)(1), the Commission shall place on the list any communications equipment or service that poses an unacceptable risk to the national security of the United States or the security and safety of United States persons based solely on one or more of the following determinations:

(1) A specific determination made by any executive branch interagency body with appropriate national security expertise, including the Federal Acquisition Security Council established under section 1322(a) of title 41, United States Code.

(2) A specific determination made by the Department of Commerce pursuant to Executive Order No. 13873 (84 Fed. Reg. 22689; relating to securing the information and communications technology and services supply chain).

(3) The communications equipment or service being covered telecommunications equipment or services, as defined in section 889(f)(3) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1918).

(4) A specific determination made by an appropriate national security agency.

(d) UPDATING OF LIST.—

(1) IN GENERAL.—The Commission shall periodically update the list published under subsection (a) to address changes in the determinations described in paragraphs (1) through (4) of subsection (c).

(2) MONITORING OF DETERMINATIONS.—The Commission shall monitor the making or reversing of the determinations described in paragraphs (1) through (4) of subsection (c) in order to place additional communications equipment or services on the list published under subsection (a) or to remove communications equipment or services from such list. If a determination described in any such paragraph that provided the basis for a determination by the Commission under subsection (b)(1) with respect to any communications equipment or service is reversed, the Commission shall remove such equipment or service from such list, except that the Commission may not remove such equipment or service from such list if any other determination described in any such paragraph provides a basis for inclusion on such list by the Commission under subsection (b)(1) with respect to such equipment or service.

(3) PUBLIC NOTIFICATION.—For each 12-month period during which the list published under subsection (a) is not updated, the Commission shall notify the public that no updates were necessary during such period to protect national security or to address changes in the determinations described in paragraphs (1) through (4) of subsection (c).

## SEC. 3. PROHIBITION ON USE OF CERTAIN FEDERAL SUBSIDIES.

(a) IN GENERAL.—

(1) PROHIBITION.—A Federal subsidy that is made available through a program administered by the Commission and that provides funds to be used for the capital expenditures necessary for the provision of advanced communications service may not be used to—

(A) purchase, rent, lease, or otherwise obtain any covered communications equipment or service; or

(B) maintain any covered communications equipment or service previously purchased, rented, leased, or otherwise obtained.

(2) TIMING.—Paragraph (1) shall apply with respect to any covered communications equipment or service beginning on the date that is 60 days after the date on which the Commission places such equipment or service on the list required by section 2(a). In the case of any covered communications equipment or service that is on the initial list published under such section, such equipment or service shall be treated as being placed on the list on the date on which such list is published.

(b) COMPLETION OF PROCEEDING.—Not later than 180 days after the date of the enactment of this Act, the Commission shall adopt a Report and Order to implement subsection (a). If the Commission has, before the date of the enactment of this Act, taken action that in whole or in part implements subsection (a), the Commission is not required to revisit such action, but only to the extent such action is consistent with this section.

## SEC. 4. SECURE AND TRUSTED COMMUNICATIONS NETWORKS REIMBURSEMENT PROGRAM.

(a) IN GENERAL.—The Commission shall establish a reimbursement program, to be known as the "Secure and Trusted Communications Networks Reimbursement Program", to make reimbursements to providers of advanced communications service to replace covered communications equipment or services.

(b) ELIGIBILITY.—The Commission may not make a reimbursement under the Program to a provider of advanced communications service unless the provider—

(1) has 2,000,000 or fewer customers; and

(2) makes all of the certifications required by subsection (d)(4).

(c) USE OF FUNDS.—

(1) IN GENERAL.—A recipient of a reimbursement under the Program shall use reimbursement funds solely for the purposes of—

(A) permanently removing covered communications equipment or services purchased, rented, leased, or otherwise obtained before—

(i) in the case of any covered communications equipment or services that are on the initial list published under section 2(a), August 14, 2018; or

(ii) in the case of any covered communications equipment or services that are not on the initial list published under section 2(a), the date that is 60 days after the date on which the Commission places such equipment or services on the list required by such section;

(B) replacing the covered communications equipment or services removed as described in subparagraph (A) with communications equipment or services that are not covered communications equipment or services; and

(C) disposing of the covered communications equipment or services removed as described in subparagraph (A) in accordance with the requirements under subsection (d)(7).

(2) LIMITATIONS.—A recipient of a reimbursement under the Program may not—

(A) use reimbursement funds to remove, replace, or dispose of any covered communications equipment or service purchased, rented, leased, or otherwise obtained on or after—

(i) in the case of any covered communications equipment or service that is on the initial list published under section 2(a), August 14, 2018; or

(ii) in the case of any covered communications equipment or service that is not on the initial list published under section 2(a), the date that is 60 days after the date on which the Commission places such equipment or service on the list required by such section; or

(B) purchase, rent, lease, or otherwise obtain any covered communications equipment or service, using reimbursement funds or any other funds (including funds derived from private sources).

(d) IMPLEMENTATION.—

(1) SUGGESTED REPLACEMENTS.—

(A) DEVELOPMENT OF LIST.—The Commission shall develop a list of suggested replacements of both physical and virtual communications equipment, application and management software, and services or categories of replacements of both physical and virtual communications equipment, application and management software and services.

(B) NEUTRALITY.—The list developed under subparagraph (A) shall be technology neutral and may not advantage the use of reimbursement funds for capital expenditures over operational expenditures, to the extent that the Commission determines that communications services can serve as an adequate substitute for the installation of communications equipment.

(2) APPLICATION PROCESS.—

(A) IN GENERAL.—The Commission shall develop an application process and related forms and materials for the Program.

(B) COST ESTIMATE.—

(i) INITIAL ESTIMATE.—The Commission shall require an applicant to provide an initial reimbursement cost estimate at the time of application, with supporting materials substantiating the costs.

(ii) UPDATES.—During and after the application review process, the Commission may require an applicant to—

(I) update the initial reimbursement cost estimate submitted under clause (i); and

(II) submit additional supporting materials substantiating an updated cost estimate submitted under subclause (I).

(C) MITIGATION OF BURDEN.—In developing the application process under this paragraph, the Commission shall take reasonable steps to mitigate the administrative burdens and costs associated with the application process, while taking into account the need to avoid waste, fraud, and abuse in the Program.

(3) APPLICATION REVIEW PROCESS.—

(A) DEADLINE.—

(i) IN GENERAL.—Except as provided in clause (ii) and subparagraph (B), the Commission shall approve or deny an application for a reimbursement under the Program not later than 90 days after the date of the submission of the application.

(ii) ADDITIONAL TIME NEEDED BY COMMISSION.—If the Commission determines that, because an excessive number of applications have been filed at one time, the Commission needs additional time for employees of the Commission to process the applications, the Commission may extend the deadline described in clause (i) for not more than 45 days.

(B) OPPORTUNITY FOR APPLICANT TO CURE DEFICIENCY.—If the Commission determines that an application is materially deficient (including by lacking an adequate cost estimate or adequate supporting materials), the Commission shall provide the applicant a 15-day period to cure the defect before denying the application. If such period would extend beyond the deadline under subparagraph (A) for approving or denying the application, such deadline shall be extended through the end of such period.

(C) EFFECT OF DENIAL.—Denial of an application for a reimbursement under the Program shall not preclude the applicant from resubmitting the application or submitting a new application for a reimbursement under the Program at a later date.

(4) CERTIFICATIONS.—An applicant for a reimbursement under the Program shall, in the application of the applicant, certify to the Commission that—

(A) as of the date of the submission of the application, the applicant—

(i) has developed a plan for—

(I) the permanent removal and replacement of any covered communications equipment or services that are in the communications network of the applicant as of such date; and

(II) the disposal of the equipment or services removed as described in subclause (I) in accordance with the requirements under paragraph (7); and

(ii) has developed a specific timeline (subject to paragraph (6)) for the permanent removal, replacement, and disposal of the covered communications equipment or services identified under clause (i), which timeline shall be submitted to the Commission as part of the application; and

(B) beginning on the date of the approval of the application, the applicant—

(i) will not purchase, rent, lease, or otherwise obtain covered communications equipment or services, using reimbursement funds or any other funds (including funds derived from private sources); and

(ii) in developing and tailoring the risk management practices of the applicant, will consult and consider the standards, guidelines, and best practices set forth in the cybersecurity framework developed by the National Institute of Standards and Technology.

(5) DISTRIBUTION OF REIMBURSEMENT FUNDS.—

(A) IN GENERAL.—The Commission shall make reasonable efforts to ensure that reimbursement funds are distributed equitably among all applicants for reimbursements under the Program according to the needs of the applicants, as identified by the applications of the applicants.

(B) NOTIFICATION.—If, at any time during the implementation of the Program, the Commission determines that $1,000,000,000 will not be sufficient to fully fund all approved applications for reimbursements under the Program, the Commission shall immediately notify—

(i) the Committee on Energy and Commerce and the Committee on Appropriations of the House of Representatives; and

(ii) the Committee on Commerce, Science, and Transportation and the Committee on Appropriations of the Senate.

(6) REMOVAL, REPLACEMENT, AND DISPOSAL TERM.—

(A) DEADLINE.—Except as provided in subparagraphs (B) and (C), the permanent removal, replacement, and disposal of any covered communications equipment or services identified under paragraph (4)(A)(i) shall be completed not later than 1 year after the date on which the Commission distributes reimbursement funds to the recipient.

(B) GENERAL EXTENSION.—The Commission may grant an extension of the deadline described in subparagraph (A) for 6 months to all recipients of reimbursements under the Program if the Commission—

(i) finds that the supply of replacement communications equipment or services needed by the recipients to achieve the purposes of the Program is inadequate to meet the needs of the recipients; and

(ii) provides notice and a detailed justification for granting the extension to—

(I) the Committee on Energy and Commerce of the House of Representatives; and

(II) the Committee on Commerce, Science, and Transportation of the Senate.

(C) INDIVIDUAL EXTENSION.—

(i) PETITION.—A recipient of a reimbursement under the Program may petition the Commission for an extension for such recipient of the deadline described in subparagraph (A) or, if the Commission has granted an extension of such deadline under subparagraph (B), such deadline as so extended.

(ii) GRANT.—The Commission may grant a petition filed under clause (i) by extending, for the recipient that filed the petition, the deadline described in subparagraph (A) or, if the Commission has granted an extension of such deadline under subparagraph (B), such deadline as so extended, for a period of not more than 6 months if the Commission finds that, due to no fault of such recipient, such recipient is unable to complete the permanent removal, replacement, and disposal described in subparagraph (A).

(7) DISPOSAL OF COVERED COMMUNICATIONS EQUIPMENT OR SERVICES.—The Commission shall include in the regulations promulgated under subsection (g) requirements for the disposal by a recipient of a reimbursement under the Program of covered communications equipment or services identified under paragraph (4)(A)(i) and removed from the network of the recipient in order to prevent such equipment or services from being used in the networks of providers of advanced communications service.

(8) STATUS UPDATES.—

(A) IN GENERAL.—Not less frequently than once every 90 days beginning on the date on which the Commission approves an application for a reimbursement under the Program, the recipient of the reimbursement shall submit to the Commission a status update on the work of the recipient to permanently remove, replace, and dispose of the covered communications equipment or services identified under paragraph (4)(A)(i).

(B) PUBLIC POSTING.—Not earlier than 30 days after the date on which the Commission receives a status update under subparagraph (A), the Commission shall make such status update public on the website of the Commission.

(C) REPORTS TO CONGRESS.—Not less frequently than once every 180 days beginning on the date on which the Commission first makes funds available to a recipient of a reimbursement under the Program, the Commission shall prepare and submit to the Committee on Energy and

Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a report on—

(i) the implementation of the Program by the Commission; and

(ii) the work by recipients of reimbursements under the Program to permanently remove, replace, and dispose of covered communications equipment or services identified under paragraph (4)(A)(i).

(e) MEASURES TO AVOID WASTE, FRAUD, AND ABUSE.—

(1) IN GENERAL.—The Commission shall take all necessary steps to avoid waste, fraud, and abuse with respect to the Program.

(2) SPENDING REPORTS.—The Commission shall require recipients of reimbursements under the Program to submit to the Commission on a regular basis reports regarding how reimbursement funds have been spent, including detailed accounting of the covered communications equipment or services permanently removed and disposed of, and the replacement equipment or services purchased, rented, leased, or otherwise obtained, using reimbursement funds.

(3) AUDITS, REVIEWS, AND FIELD INVESTIGATIONS.—The Commission shall conduct—

(A) regular audits and reviews of reimbursements under the Program to confirm that recipients of such reimbursements are complying with this Act; and

(B) random field investigations to ensure that recipients of reimbursements under the Program are performing the work such recipients are required to perform under the commitments made in the applications of such recipients for reimbursements under the Program, including the permanent removal, replacement, and disposal of the covered communications equipment or services identified under subsection (d)(4)(A)(i).

(4) FINAL CERTIFICATION.—

(A) IN GENERAL.—The Commission shall require a recipient of a reimbursement under the Program to submit to the Commission, in a form and at an appropriate time to be determined by the Commission, a certification stating that the recipient—

(i) has fully complied with (or is in the process of complying with) all terms and conditions of the Program;

(ii) has fully complied with (or is in the process of complying with) the commitments made in the application of the recipient for the reimbursement;

(iii) has permanently removed from the communications network of the recipient, replaced, and disposed of (or is in the process of permanently removing, replacing, and disposing of) all covered communications equipment or services that were in the network of the recipient as of the date of the submission of the application of the recipient for the reimbursement; and

(iv) has fully complied with (or is in the process of complying with) the timeline submitted by the recipient under subparagraph (A)(ii) of paragraph (4) of subsection (d) and the other requirements of such paragraph.

(B) UPDATED CERTIFICATION.—If, at the time when a recipient of a reimbursement under the Program submits a certification under subparagraph (A), the recipient has not fully complied as described in clause (i), (ii), or (iv) of such subparagraph or has not completed the permanent removal, replacement, and disposal described in clause (iii) of such subparagraph, the Commission shall require the recipient to file an updated certification when the recipient has fully complied as described in such clause (i), (ii), or (iv) or completed such permanent removal, replacement, and disposal.

(f) EFFECT OF REMOVAL OF EQUIPMENT OR SERVICE FROM LIST.—

(1) IN GENERAL.—If, after the date on which a recipient of a reimbursement under the Program submits the application for the reimbursement, any covered communications equipment or service that is in the network of the recipient as of such date is removed from the list published under section 2(a), the recipient may—

(A) return to the Commission any reimbursement funds received for the removal, replacement, and disposal of such equipment or service and be released from any requirement under this section to remove, replace, or dispose of such equipment or service; or

(B) retain any reimbursement funds received for the removal, replacement, and disposal of such equipment or service and remain subject to the requirements of this section to remove, replace, and dispose of such equipment or service as if such equipment or service continued to be on the list published under section 2(a).

(2) ASSURANCES.—In the case of an assurance relating to the removal, replacement, or disposal of any equipment or service with respect to which the recipient returns to the Commission reimbursement funds under paragraph (1)(A), such assurance may be satisfied by making an assurance that such funds have been returned.

(g) RULEMAKING.—

(1) COMMENCEMENT.—Not later than 90 days after the date of the enactment of this Act, the Commission shall commence a rulemaking to implement this section.

(2) COMPLETION.—The Commission shall complete the rulemaking under paragraph (1) not later than 1 year after the date of the enactment of this Act.

(h) RULE OF CONSTRUCTION REGARDING TIMING OF REIMBURSEMENT.—Nothing in this section shall be construed to prohibit the Commission from making a reimbursement under the Program to a provider of advanced communications service before the provider incurs the cost of the permanent removal, replacement, and disposal of the covered communications equipment or service for which the application of the provider has been approved under this section.

(i) EDUCATION EFFORTS.—The Commission shall engage in education efforts with providers of advanced communications service to—

(1) encourage such providers to participate in the Program; and

(2) assist such providers in submitting applications for the Program.

(j) SEPARATE FROM FEDERAL UNIVERSAL SERVICE PROGRAMS.—The Program shall be separate from any Federal universal service program established under section 254 of the Communications Act of 1934 (47 U.S.C. 254).

## SEC. 5. REPORTS ON COVERED COMMUNICATIONS EQUIPMENT OR SERVICES.

(a) IN GENERAL.—Each provider of advanced communications service shall submit an annual report to the Commission, in a form to be determined by the Commission, regarding whether such provider has purchased, rented, leased, or otherwise obtained any covered communications equipment or service on or after—

(1) in the case of any covered communications equipment or service that is on the initial list published under section 2(a), August 14, 2018; or

(2) in the case of any covered communications equipment or service that is not on the initial list published under section 2(a), the date that is 60 days after the date on which the Commission places such equipment or service on the list required by such section.

(b) RULE OF CONSTRUCTION.—If a provider of advanced communications service certifies to the Commission that such provider does not have any covered communications equipment or service in the network of such provider, such provider is not required to submit a report under subsection (a) after making such certification, unless such provider later purchases, rents, leases, or otherwise obtains any covered communications equipment or service.

(c) JUSTIFICATION.—If a provider of advanced communications service indicates in a report under subsection (a) that such provider has purchased, rented, leased, or otherwise obtained any covered communications equipment or service as described in such subsection, such provider shall include in such report—

(1) a detailed justification for such action;

(2) information about whether such covered communications equipment or service has subsequently been removed and replaced pursuant to section 4; and

(3) information about whether such provider plans to continue to purchase, rent, lease, or otherwise obtain, or install or use, such covered communications equipment or service and, if so, why.

(d) PROCEEDING.—The Commission shall implement this section as part of the rulemaking required by section 4(g).

## SEC. 6. HOLD HARMLESS.

In the case of a person who is a winner of the Connect America Fund Phase II auction, has not yet been authorized to receive Connect America Fund Phase II support, and demonstrates an inability to reasonably meet the build-out and service obligations of such person under Connect America Fund Phase II without using equipment or services prohibited under this Act, such person may withdraw the application of such person for Connect America Fund Phase II support without being found in default or subject to forfeiture. The Commission may set a deadline to make such a withdrawal that is not earlier than the date that is 60 days after the date of the enactment of this Act.

## SEC. 7. ENFORCEMENT.

(a) VIOLATIONS.—A violation of this Act or a regulation promulgated under this Act shall be treated as a violation of the Communications Act of 1934 (47 U.S.C. 151 et seq.) or a regulation promulgated under such Act, respectively. The

Commission shall enforce this Act and the regulations promulgated under this Act in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Communications Act of 1934 were incorporated into and made a part of this Act.

(b) ADDITIONAL PENALTIES.—

(1) IN GENERAL.—Except as provided in paragraph (2), in addition to penalties under the Communications Act of 1934, a recipient of a reimbursement under the Program found to have violated section 4, the regulations promulgated under such section, or the commitments made by the recipient in the application for the reimbursement—

(A) shall repay to the Commission all reimbursement funds provided to the recipient under the Program;

(B) shall be barred from further participation in the Program;

(C) shall be referred to all appropriate law enforcement agencies or officials for further action under applicable criminal and civil laws; and

(D) may be barred by the Commission from participation in other programs of the Commission, including the Federal universal service support programs established under section 254 of the Communications Act of 1934 (47 U.S.C. 254).

(2) NOTICE AND OPPORTUNITY TO CURE.—The penalties described in paragraph (1) shall not apply to a recipient of a reimbursement under the Program unless—

(A) the Commission provides the recipient with notice of the violation; and

(B) the recipient fails to cure the violation within 180 days after the Commission provides such notice.

(c) RECOVERY OF FUNDS.—The Commission shall immediately take action to recover all reimbursement funds awarded to a recipient of a reimbursement under the Program in any case in which such recipient is required to repay reimbursement funds under subsection (b)(1)(A).

## SEC. 8. NTIA PROGRAM FOR PREVENTING FUTURE VULNERABILITIES.

(a) FUTURE VULNERABILITY PROGRAM.—

(1) ESTABLISHMENT.—Not later than 120 days after the date of the enactment of this Act, including an opportunity for notice and comment, the Assistant Secretary, in cooperation with the Director of National Intelligence,

the Director of the Federal Bureau of Investigation, the Secretary of Homeland Security, and the Commission, shall establish a program to share information regarding supply chain security risks with trusted providers of advanced communications service and trusted suppliers of communications equipment or services.

(2) ACTIVITIES.—In carrying out the program established under paragraph (1), the Assistant Secretary shall—

(A) conduct regular briefings and other events to share information with trusted providers of advanced communications service and trusted suppliers of communications equipment or services;

(B) engage with trusted providers of advanced communications service and trusted suppliers of communications equipment or services, in particular such providers and suppliers that—

(i) are small businesses; or

(ii) primarily serve rural areas;

(C) not later than 180 days after the date of the enactment of this Act, submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a plan for—

(i) declassifying material, when feasible, to help share information regarding supply chain security risks with trusted providers of advanced communications service and trusted suppliers of communications equipment or services; and

(ii) expediting and expanding the provision of security clearances to facilitate information sharing regarding supply chain security risks with trusted providers of advanced communications service and trusted suppliers of communications equipment or services; and

(D) ensure that the activities carried out through the program are consistent with and, to the extent practicable, integrated with, ongoing activities of the Department of Homeland Security and the Department of Commerce.

(3) SCOPE OF PROGRAM.—The program established under paragraph (1) shall involve only the sharing of information regarding supply chain security risks by the Federal Government to trusted providers of advanced communications service and trusted suppliers of communications equipment or services, and not the sharing of such information by such providers and suppliers to the Federal Government.

(b) REPRESENTATION ON CSRIC OF INTERESTS OF PUBLIC AND CONSUMERS.—

(1) IN GENERAL.—The Commission shall appoint to the Communications Security, Reliability, and Interoperability Council (or any successor thereof), and to each subcommittee, workgroup, or other subdivision of the Council (or any such successor), at least one member to represent the interests of the public and consumers.

(2) INITIAL APPOINTMENTS.—The Commission shall make the initial appointments required by paragraph (1) not later than 180 days after the date of the enactment of this Act. Any member so appointed shall be in addition to the members of the Council, or the members of the subdivision of the Council to which the appointment is being made, as the case may be, as of the date of the enactment of this Act.

(c) DEFINITIONS.—In this section:

(1) ASSISTANT SECRETARY.—The term "Assistant Secretary" means the Assistant Secretary of Commerce for Communications and Information.

(2) FOREIGN ADVERSARY.—The term "foreign adversary" means any foreign government or foreign nongovernment person engaged in a long-term pattern or serious instances of conduct significantly adverse to the national security of the United States or security and safety of United States persons.

(3) SUPPLY CHAIN SECURITY RISK.—The term "supply chain security risk" includes specific risk and vulnerability information related to equipment and software.

(4) TRUSTED.—The term "trusted" means, with respect to a provider of advanced communications service or a supplier of communications equipment or service, that the Assistant Secretary has determined that such provider or supplier is not owned by, controlled by, or subject to the influence of a foreign adversary.

## SEC. 9. DEFINITIONS.

In this Act:

(1) ADVANCED COMMUNICATIONS SERVICE.—The term "advanced communications service" has the meaning given the term "advanced telecommunications capability" in section 706 of the Telecommunications Act of 1996 (47 U.S.C. 1302).

(2) APPROPRIATE NATIONAL SECURITY AGENCY.—The term "appropriate national security agency" means—

(A) the Department of Homeland Security;

(B) the Department of Defense;

(C) the Office of the Director of National Intelligence;

(D) the National Security Agency; and

(E) the Federal Bureau of Investigation.

(3) COMMISSION.—The term "Commission" means the Federal Communications Commission.

(4) COMMUNICATIONS EQUIPMENT OR SERVICE.—The term "communications equipment or service" means any equipment or service that is essential to the provision of advanced communications service.

(5) COVERED COMMUNICATIONS EQUIPMENT OR SERVICE.—The term "covered communications equipment or service" means any communications equipment or service that is on the list published by the Commission under section 2(a).

(6) CUSTOMERS.—The term "customers" means, with respect to a provider of advanced communications service—

(A) the customers of such provider; and

(B) the customers of any affiliate (as defined in section 3 of the Communications Act of 1934 (47 U.S.C. 153)) of such provider.

(7) EXECUTIVE BRANCH INTERAGENCY BODY.—The term "executive branch interagency body" means an interagency body established in the executive branch.

(8) PERSON.—The term "person" means an individual or entity.

(9) PROGRAM.—The term "Program" means the Secure and Trusted Communications Networks Reimbursement Program established under section 4(a).

(10) PROVIDER OF ADVANCED COMMUNICATIONS SERVICE.—The term "provider of advanced communications service" means a person who provides advanced communications service to United States customers.

(11) RECIPIENT.—The term "recipient" means any provider of advanced communications service the application of which for a reimbursement under the Program has been approved by the Commission, regardless of whether the provider has received reimbursement funds.

(12) REIMBURSEMENT FUNDS.—The term "reimbursement funds" means any reimbursement received under the Program.

## SEC. 10. SEVERABILITY.

If any provision of this Act, or the application of such a provision to any person or circumstance, is held to be unconstitutional, the remaining provisions of this Act, and the application of such provisions to any person or circumstance, shall not be affected thereby.

## SEC. 11. DETERMINATION OF BUDGETARY EFFECTS.

The budgetary effects of this Act, for the purpose of complying with the Statutory Pay-As-You-Go Act of 2010, shall be determined by reference to the latest statement titled "Budgetary Effects of PAYGO Legislation" for this Act, submitted for printing in the Congressional Record by the Chairman of the House Budget Committee, provided that such statement has been submitted prior to the vote on passage.

**2019 NDAA § 889**

## SEC. 889. PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT.

(a) PROHIBITION ON USE OR PROCUREMENT.—(1) The head of an executive agency may not—

(A) procure or obtain or extend or renew a contract to procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system; or

(B) enter into a contract (or extend or renew a contract) with an entity that uses any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

(2) Nothing in paragraph (1) shall be construed to—

(A) prohibit the head of an executive agency from procuring with an entity to provide a service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements; or

(B) cover telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles.

(b) PROHIBITION ON LOAN AND GRANT FUNDS.—(1) The head of an executive agency may not obligate or expend loan or grant funds to procure or obtain, extend or renew a contract to procure or obtain, or enter into a contract (or extend or renew a contract) to procure or obtain the equipment, services, or systems described in subsection (a).

(2) In implementing the prohibition in paragraph (1), heads of executive agencies administering loan, grant, or subsidy programs, including the heads of the Federal Communications Commission, the Department of Agriculture, the Department of Homeland Security, the Small Business Administration, and the Department of Commerce, shall prioritize available funding and technical support to assist affected businesses, institutions and organizations as is reasonably necessary for those affected entities to transition from covered communications equipment and services, to procure replacement equipment and

services, and to ensure that communications service to users and customers is sustained.

(3) Nothing in this subsection shall be construed to—

(A) prohibit the head of an executive agency from procuring with an entity to provide a service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements; or

(B) cover telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles.

(c) EFFECTIVE DATES.—The prohibition under subsection (a)(1)(A) shall take effect one year after the date of the enactment of this Act, and the prohibitions under subsections (a)(1)(B) and (b)(1) shall take effect two years after the date of the enactment of this Act.

(d) WAIVER AUTHORITY.—

(1) EXECUTIVE AGENCIES.—The head of an executive agency may, on a one-time basis, waive the requirements under subsection (a) with respect to an entity that requests such a waiver. The waiver may be provided, for a period of not more than two years after the effective dates described in subsection (c), if the entity seeking the waiver—

(A) provides a compelling justification for the additional time to implement the requirements under such subsection, as determined by the head of the executive agency; and

(B) submits to the head of the executive agency, who shall not later than 30 days thereafter submit to the appropriate congressional committees, a full and complete laydown of the presences of covered telecommunications or video surveillance equipment or services in the entity's supply chain and a phase-out plan to eliminate such covered telecommunications or video surveillance equipment or services from the entity's systems.

(2) DIRECTOR OF NATIONAL INTELLIGENCE.—The Director of National Intelligence may provide a waiver on a date later than the effective dates described in subsection (c) if the Director determines the waiver is in the national security interests of the United States.

(f) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees'" means—

(A) the Committee on Banking, Housing, and Urban Affairs, the Committee on Foreign Relations, and the Committee on Homeland Security and Governmental Affairs of the Senate; and

(B) the Committee on Financial Services, the Committee on Foreign Affairs, and the Committee on Oversight and Government Reform of the House of Representatives.

(2) COVERED FOREIGN COUNTRY.—The term "covered foreign country" means the People's Republic of China.

(3) COVERED TELECOMMUNICATIONS EQUIPMENT OR SERVICES.—The term "covered telecommunications equipment or services" means any of the following:

(A) Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

(B) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

(C) Telecommunications or video surveillance services provided by such entities or using such equipment.

(D) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

(4) EXECUTIVE AGENCY.—The term "executive agency" has the meaning given the term in section 133 of title 41, United States Code.

## 2019 NDAA § 1703

## SEC. 1703. DEFINITIONS.

(5) Critical infrastructure.—The term `critical infrastructure' means, subject to regulations prescribed by the Committee, systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems or assets would have a debilitating impact on national security.

**Communications Act of 1934, Pub. L. No. 90-379, 82 Stat. 290 (amended 1968)**

AN ACT

To amend the Communications Act of 1934, as amended, to give the Federal Communications Commission authority to prescribe regulations for the manufacture, import, sale, shipment, or use of devices which cause harmful interference to radio reception.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Communications Act of 1934, as amended, is further amended by adding thereto a new section 302 to read as follows:

"DEVICES WHICH INTERFERE WITH RADIO RECEPTION "

SEC. 302. (a) The Commission may, consistent with the public interest, convenience, and necessity, make reasonable regulations governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications. Such regulations shall be applicable to the manufacture, import, sale, offer for sale, shipment, or use of such devices.

"(b) No person shall manufacture, import, sell, offer for sale, ship, or use devices which fail to comply with regulations promulgated pursuant to this section.

"(c) The provisions of this section shall not be applicable to carriers transporting such devices without trading in them, to devices manufactured solely for export, to the manufacture, assembly, or installation of devices for its own use by a public utility engaged in providing electric service, or to devices for use by the (Government of the United States or any agency thereof. Devices for use by the Government of the United States or any agency thereof shall be developed, procured, or otherwise acquired, including offshore procurement, under United States Government criteria, standards, or specifications designed to achieve the common objective of reducing interference to radio reception, taking into account the unique needs of national defense and security."